160 P.3d 17 (2007)
BANK OF AMERICA, N.A., Respondent,
v.
PRESTANCE CORPORATION, a Washington corporation; Prestance Japan Corporation, a Japanese corporation; Sakae and Yuko Sugihara, husband and wife, Defendants, and
Wells Fargo Bank, N.A., a national banking association; and Wells Fargo Bank West, N.A., a national banking association, Petitioners.
No. 77038-7.
Supreme Court of Washington, En Banc.
Argued May 9, 2006.
Decided June 7, 2007.
Michael B. King, Talmadge Law Group PLLC, Tukwila, Mark A. Rossi, Bank of Hawaii, John Schochet, Dorsey & Whitney, LLP, Seattle, for petitioners.
Stephen M. Rummage, Craig W. Miller, Davis Wright Tremaine, LLP, Seattle, for respondent.
SANDERS, J.
¶ 1 We are asked to define the contours of equitable subrogation in the context of refinancing mortgagees. Washington Mutual had a first-priority lien on Sakae Sugihara's personal residence, while Bank of America had a second-priority lien. Wells Fargo Bank West (WFB West) seeks to be equitably subrogated to Washington Mutual's first-priority lien position because it paid Sugihara's debt to Washington Mutual. Bank of America argues WFB West cannot be given first-priority status because WFB West knew Bank of America had an intervening interest.
¶ 2 The trial court followed the Restatement (Third) of Property: Mortgages § 7.6 Subrogation (1997) [hereinafter Restatement (Third) § 7.6] and granted WFB West's request for equitable subrogation. The Court of Appeals reversed. We now reverse the Court of Appeals and adopt § 7.6 of the Restatement (Third). We hold a lender can be equitably subrogated to a first-priority lien despite having actual or constructive knowledge of junior lienholders.

I. Facts
¶ 3 On August 8, 1994, Sakae and Yuko Sugihara received a 30-year home loan of $543,150 from Washington Mutual, which *19 Washington Mutual secured with a deed of trust on the property.[1] Between August 1999 and December 2001, Sakae Sugihara took out a series of business and home equity loans, each time pledging the residence as at least a portion of the security. In August 1999 Bank of America made a revolving loan of $400,000 to Prestance Corporation, a Washington corporation owned by Sugihara; the loan was secured, in part, by the Sugiharas' deed of trust on their home. In October 2000 Bank of America gave Prestance Corporation and Prestance Japan Corporation, a Japanese corporation likewise owned by Sugihara, an additional line of credit for $1,000,000, receiving Sugihara's personal guaranty and an amendment to the August 1999 deed of trust. The second loan had a due date of October 28, 2001.
¶ 4 In November 2001 Sugihara approached WFB West for $1,000,000, which was to be secured by a deed of trust on the property.[2] One purpose of the loan was to pay off the first-position Washington Mutual loan. WFB West expected it would then have priority over the other loans for the amount used to pay Washington Mutual. A preliminary title commitment showed the Bank of America loans, secured by the Bank of America deed of trust and its amendment. In December 2001 WFB West approved the $1,000,000 home equity line of credit. When the WFB West loan closed on December 21, 2001, it was WFB West's understanding that Bank of America's deed of trust had been (or was being) reconveyed to Wells Fargo Bank (WFB) and that WFB would subordinate its $500,000 loan, putting the WFB West deed of trust in first position.
¶ 5 Bank of America sued the Sugiharas, Prestance, Prestance Japan, WFB, and WFB West, seeking a money judgment and foreclosure to remedy the default on the second Bank of America loan. Following a three-day bench trial in September 2003, the trial court judge relied upon and cited Restatement (Third) § 7.6 to hold WFB West should be equitably subrogated to the first-priority lien position of Washington Mutual in the payoff amount of $499,477, leaving Bank of America "in no worse position than it would have been [in] had [WFB West] never made its . . . loan." Clerk's Papers at 600.
¶ 6 Bank of America appealed the equitable subrogation issue, and WFB cross-appealed on the issue of whether Bank of America had a contractual duty implied in law to reconvey its deed of trust to WFB. The Court of Appeals reversed the trial court's application of equitable subrogation, holding that, under this Court's decision in Kim v. Lee, 145 Wash.2d 79, 31 P.3d 665, 43 P.3d 1222 (2001), WFB West's actual knowledge of Bank of America's lien barred the application of equitable subrogation. Bank of Am. v. Wells Fargo Bank, 126 Wash.App. 710, 719-20, 109 P.3d 863 (2005). The court affirmed the trial court's determination that no contract implied in law existed between WFB and Bank of America. Id. at 722-23, 109 P.3d 863. WFB and WFB West petitioned this court for review on whether it should be equitably subrogated to Washington Mutual, thereby receiving a first-priority lien ahead of Bank of America.

II. Standard of Review
¶ 7 The only issue before us is a legal one: should we adopt § 7.6 of Restatement (Third) to hold a refinancing mortgagee's actual or constructive knowledge of intervening liens does not automatically preclude a court from applying equitable subrogation. "[T]he question of whether equitable relief is appropriate is a question of law," Niemann v. Vaughn Cmty. Church, 154 Wash.2d 365, 374, 113 P.3d 463 (2005), and like all issues of law our review is de novo.
¶ 8 This is a question of first impression for this court. The Court of Appeals claimed *20 our holding in Kim is dispositve. Bank of Am., 126 Wash.App. at 719-20, 109 P.3d 863. But our holding in Kim addressed whether a refinancing mortgagee's title insurer could benefit from equitable subrogation if the insurer had actual knowledge of intervening liens. The facts before us today are different and concern whether a refinancing mortgagee, not a title insurer, must be precluded from equitable subrogation if he has actual knowledge of intervening liens.

III. Equitable Subrogation Doctrine
¶ 9 Borrowed from English courts of equity, equitable subrogation simply seeks to maintain the proper order of priorities. Burgoon v. Lavezzo, 68 App. D.C. 20, 92 F.2d 726, 729 (Cir.1937).[3] For example, suppose A, a homeowner, has two mortgages: one recorded first by bank B and one recorded second by bank C. Our recording act says B has a higher priority because it recorded first, putting the world on notice as to its interest in A's land. RCW 65.08.070. If D fully discharges B's debt, then equitable subrogation substitutes D for B, so D has a higher priority than C, even though D recorded after. See Jackson Co. v. Boylston Mut. Ins. Co., 139 Mass. 508, 510, 2 N.E. 103, 104 (1885) ("Subrogation is the substitution of one person in place of another . . . so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities."). At first blush, equitable subrogation conflicts with the recording act because it is an exception to the general rule "first in time, first in right." But no new lien or interest is created; D simply takes over B's interest and that interest came first in time. C never expected his priority to be promoted simply because A refinanced the mortgage with a new company. C bargained with A to have a second-priority mortgage; it is immaterial who has priority before C.[4] See RESTATEMENT (THIRD) § 7.6 cmt. a, at 510 ("The holders of intervening interests can hardly complain about this result, for they are no worse off than before the senior obligation was discharged."). Equitable subrogation preserves the proper priorities by keeping the first mortgage first and the second mortgage second.
¶ 10 Despite an initial resistance to equitable subrogation, many courts now apply it liberally. See Martin v. Hickenlooper, 90 Utah 150, 161, 59 P.2d 1139, 1144 (1936) ("It will be seen that the more recent cases show a very decided liberality over the stricter cases of a generation ago."). This language from an Arkansas Supreme Court opinion, applying subrogation freely with regard to "perfect justice" instead of unnecessary rules, is typical:
"The doctrine of subrogation is an equitable one, having for its basis the doing of complete and perfect justice between the parties without regard to form, and its purpose and object is the prevention of injustice. . . .
"It rests upon the maxim that no one shall be enriched by another's loss, and may be invoked wherever justice and good conscience demand its application in opposition to the technical rules of law, which liberate securities with the extinguishment of the original debt. . . .
Cox v. Wooten Bros. Farms, Inc., 271 Ark. 735, 737-38, 610 S.W.2d 278, 280 (1981) (quoting Baker v. Leigh, 238 Ark. 918, 923-24, 385 S.W.2d 790, 794 (1965)); see also Home Sav. Bank v. Bierstadt, 168 Ill. 618, 48 N.E. 161, 162 (1897) ("[Equitable subrogation] has been steadily expanding and growing in importance and extent in its application to various subjects and classes of persons. This equitable principle is enforced solely for the accomplishment of substantial justice where one has an equity to invoke which cannot injure an innocent person.").
*21 ¶ 11 But Bank of America asks us to adopt an unnecessarily limited view of equitable subrogation where a party is barred from seeking relief whenever he has actual knowledge of the intervening interests. This ignores subrogation's equitable underpinnings, misunderstands its use in a refinancing context, and dismisses important policy concerns  all to give credence to a rule that serves no meaningful purpose.
IV. Different Jurisdictional Approaches
¶ 12 Courts generally consider knowledge in one of three ways when applying equitable subrogation to a refinancing lender. First, the Restatement approach that says actual or constructive knowledge of intervening interests is irrelevant; second, a minority approach that says a plaintiff with either actual or constructive knowledge cannot seek equitable subrogation; and third, a "majority" approach[5] that says a plaintiff with actual knowledge cannot seek equitable subrogation, while one with constructive notice can.
A. The Restatement Approach
¶ 13 The Restatement posits a subrogee's knowledge of junior interests is irrelevant. See RESTATEMENT (THIRD) § 7.6 cmt. e, at 520 ("[S]ubrogation can be granted even if the payor had actual knowledge of the intervening interest. . . . The question in such cases is whether the payor reasonably expected to get security with a priority equal to the mortgage being paid."). The American Law Institute (ALI) properly emphasizes equitable subrogation's concern of unjust enrichment: "Subrogation is an equitable remedy designed to avoid a person's receiving an unearned windfall at the expense of another." Id. cmt. a.[6] And junior lienholders will be unjustly enriched whether the subrogee knew about them or not.
B. The Minority Approach
¶ 14 But the ALI recognizes its approach conflicts with a majority of state court decisions. Of those states that require some knowledge, there is a further distinction. A minority of those jurisdictions deny equitable subrogation if a party knows or should have known there were intervening interests. The rationale for this rule is a party should not profit by its negligence in failing to check the records. The Missouri Supreme Court, in its first equitable subrogation case, explained its reluctance to allow a party to profit by its negligence:
That plaintiff's security was less valuable than he expected it would be when he made the loan was the result of his own negligence, and not of the fault, wrong, or mistake of any other person. Against the consequences of that negligence, for which he has no one to blame but himself, a court of equity cannot relieve him by interfering with the legal rights of others who are without fault.
Bunn v. Lindsay, 95 Mo. 250, 7 S.W. 473, 476 (1888).
¶ 15 For practical purposes, this rule swallows the doctrine and is widely criticized. A more recent Alabama Supreme Court case rejected this approach: "If all persons who negligently confer an economic benefit upon another are disqualified from equitable relief because of their negligence, then the law of restitution, which was conceived in order to prevent unjust enrichment, would be of little or no value." Ex Parte AmSouth Mortgage, 679 So.2d 251, 255 (Ala.1996) ("`[O]ne is not penalized for lack of care unless this results in harm to someone else.'") (quoting Restatement of Law of Restitution § 59 cmts. at 232 (1937)); see also Trus Joist Corp. v. Nat'l Union Fire Ins. Co., 190 N.J.Super. 168, 462 A.2d 603, 609 (1983) ("There is no doubt that a mortgagee who negligently accepts a mortgage without knowledge of intervening encumbrances will subrogate to a first mortgage with priority over the intervening encumbrances. . . . This result is *22 reached so that the holders of the intervening encumbrances not be unjustly enriched at the expense of the new mortgagee."), rev'd sub nom., Trus Joist Corp. v. Treetop Assocs., Inc., 97 N.J. 22, 477 A.2d 817 (1984); Prestridge v. Lazar, 132 Miss. 168, 95 So. 837, 838 (1923) ("We are unable to see how constructive notice to appellant of appellee's [junior] mortgage could have anything to do with the right of the former to subrogation. . . . The question is: What is natural justice under the actual facts of the situation?"); Grant S. Nelson & Dale A. Whitman, Adopting Restatement Mortgage Subrogation Principles: Saving Billions of Dollars for Refinancing Homeowners, 2006 BYU L.REV. 305, 315-16 ("We have vigorously criticized this approach and find it impossible to understand in light of the fact that subrogation in this situation harms no one, leaving the intervening lien exactly where it started. In contrast, refusal to grant subrogation gives the intervening lienor an unexpected, unearned, and unwarranted promotion in priority." (footnote omitted)).
¶ 16 This rule renders equitable subrogation nearly useless since a refinancing mortgagee will almost always have either actual or constructive knowledge of junior lienholders. And equitable subrogation has little use when there are no junior lienholders because then the plaintiff is the only party with an interest in the collateral; his priority is immaterial. RESTATEMENT (THIRD) § 7.6 cmt. a. ("Subrogation to a mortgage is usually of importance only when a subordinate lien or other junior interest exists on the real estate."). The doctrine is then practical in only those few instances when the mortgagor fraudulently hides the junior interests. See State Sav. Trust Co. v. Spencer, 201 S.W. 967, 971 (Mo.Ct.App.1918) (allowing subrogation when the borrower forged subordination documents). These cases are rare.
C. The Majority Approach
¶ 17 The final approach accepts that constructive notice should not block equitable subrogation but still denies equitable subrogation if a party has actual knowledge of the intervening interests. This rule is followed by many, but by no means all, jurisdictions.[7] Three reasons are often given to support this rule. First, equitable subrogation would obstruct the predictability and stability of the recording act and the rule "first in time, first in right." Second, analogous to the reasoning in Bunn, one should not be allowed to knowingly "leap-frog" another's priority: *23 "[A]llowing subrogation . . . would permit [a party] to accomplish indirectly through `equity' what it could not otherwise accomplish directly." Picker Fin. Group L.L.C. v. Horizon Bank, 293 B.R. 253, 263 (Bankr.M.D.Fla. 2003). Third, some courts suggest a lender can rarely, if ever, reasonably expect to assume a first-priority position when he has actual knowledge of intervening liens. Rusher v. Bunker, 99 Or.App. 303, 306-07, 782 P.2d 170, 172 (1989) (citing GEORGE E. OSBORNE, MORTGAGES § 282, at 573 (2d ed.1970)).
¶ 18 These reasons are unconvincing. First, equitable subrogation cannot be said to present too great a threat to the recording act scheme if jurisdictions are willing to allow an ignorant subrogee with only constructive knowledge to come before a prior recorded interest. If those jurisdictions were truly concerned equitable subrogation might frustrate "first in time, first in right" then they would deny it in all instances instead of distinguishing between constructive notice and actual knowledge.[8]
¶ 19 Second, while the recording act provides stability and notice to lenders (both vital elements to any successful real estate lending scheme), we cannot rigidly adhere to its strictures where it works an injustice.[9] Furthermore, WFB West is not cutting in line; equity and the law are working toward the same end. While WFB West came along second, the mortgage it purchased from Washington Mutual came first, and Bank of America knew this mortgage had priority before its own. Equitable subrogation maintains the proper scheme and the original priorities. See RESTATEMENT (THIRD) § 7.6 cmt. e.
¶ 20 Third, making inferences about a refinancing lender's expectations are unwise and under the Restatement unnecessary because a lender must prove he indeed intended to get the priority. See E. Boston Sav. Bank v. Ogan, 428 Mass. 327, 334, 701 N.E.2d 331, 336 (Mass.1998) (finding a plaintiff, with knowledge, deserved equitable subrogation because "plaintiffs expected to have first priority and paid a price that reflected that expectation"); Robert M. Smith, Note, What Happened to the Equity in Equitable Subrogation?, 64 Mo. L.Rev. 503, 514 (1999). Under the Restatement, a lender will be found to lack expectation when there is "affirmative proof that the mortgagee intended to subordinate its mortgage to the intervening interest." RESTATEMENT (THIRD) § 7.6 cmt. e ("Ordinarily lenders who provide refinancing desire and expect [to get security with a priority equal to the mortgage being paid] even if they are aware of an intervening lien."). But allowing these inferences ignores the practical effect of denying equitable subrogation: the junior interest will be unjustly enriched because he will be given a higher priority merely because the debtor refinanced. See E. Boston Sav. Bank, 701 N.E.2d at 334. The trial court specifically found WFB West expected to have first priority when it advanced funds to Sugihara to pay off the Washington Mutual mortgage. Finding of Fact 20.
¶ 21 Equitable subrogation should never be allowed if a junior interest is materially prejudiced, but if the junior interests are unaffected, *24 then there is no reason to deny it. Bank of America could have assumed Washington Mutual's first-priority mortgage instead of taking a second-priority position. But Bank of America accepted the risks inherent in its security and does not deserve an unearned windfall simply because Sugihara refinanced. See id. at 331, 701 N.E.2d 331; Burgoon, 92 F.2d at 730-31; see also First Commonwealth Bank v. Heller, 2004 PA Super. 431, 863 A.2d 1153, 1158 n. 8 ("We also note that this majority approach runs counter to, or at the very least does nothing to further, the purpose of the doctrine as elucidated by the Restatements, i.e., to prevent an unjustified and unwarranted windfall on behalf of the intervening lien holder.").
¶ 22 Additionally, this approach either puts a premium on a refinancing mortgagee's ignorance or denies subrogation when there are any knowable intervening interests. First, mortgage companies could purposefully remain ignorant of intervening interests. "This approach places a premium on ignorance  not such a bad thing in the present context. If the refinancing lender can preserve the right to subrogation by avoiding knowledge (e.g., by refraining from obtaining a title examination), then refraining from examining the title is an entirely rational step and has the added advantage of saving money." Nelson & Whitman, Adopting Restatement Mortgage Subrogation Principles, supra, at 315, see also Houston v. Bank of Am. Fed. Sav. Bank, 119 Nev. 485, 489, 78 P.3d 71, 73 (2003) ("In our view, however, this rule promotes willful ignorance; it encourages prospective mortgagees to avoid conducting title searches.").
¶ 23 And if a refinancing lender must still perform a title search to "demonstrate . . . that it reasonably expected to receive a security interest in the real estate with the priority of the mortgage being discharged," RESTATEMENT (THIRD) § 7.6(b)(4), then equitable subrogation would be possible only in those rare cases when there are no knowable interests because a mortgagor fraudulently hid junior interests from a refinancing lender. This mirrors the results of the minority rule, which denies equitable subrogation whenever a subrogee had actual or constructive knowledge. Therefore, the criticisms engendered by that rule would apply with equal force to this approach. Any junior lender could effectively block any refinancing or restructuring between senior lenders and refinancing mortgagees and be unjustly enriched by their newfound higher priority.
V. The History of Equitable Subrogation
¶ 24 The rule requiring a subrogee have no knowledge of intervening interests is left over from an early mistrust of equitable subordination and was borrowed from courts applying subrogation as a restitution remedy. We abandon this rule since this early mistrust has abated, and we are concerned with refinancing mortgages, not restitution.
¶ 25 Courts have been divided in their application of equitable subrogation since its adoption in the 1800s. See Martin, 59 P.2d at 1142-44 (examining numerous equitable subrogation cases and classifying them into a traditional view and a modern view, depending on the plaintiff's knowledge).[10] A 1924 Georgia Supreme Court opinion illustrates this mistrust: "This court has denied that subrogation is a benevolent doctrine, and that equity will apply it in any case which justice required, and this court has refused *25 to follow the cases which were based on this theory of the doctrine of subrogation." Citizens' Mercantile Co. v. Easom, 158 Ga. 604, 123 S.E. 883, 886 (1924); see also Kitchell v. Mudgett, 37 Mich. 81, 86 (1877) ("But the question whether or not it is equitable is altogether dependent on whether Mrs. Mudgett has consented to waive her priority. . . . If [Mrs. Mitchell] did not intend to take a second mortgage, and would have refused to do so had all the facts been known to her, then the fault is her own."). The District of Columbia Court of Appeals also recognized "[s]ome courts in this country have limited the doctrine rather strictly" but some jurisdictions applied "a more liberal application of the doctrine, said by some authorities to be applicable to almost all cases in which one person, not a volunteer, pays an obligation which in justice and good conscience ought to have been paid by another." Burgoon, 92 F.2d at 729. The Burgoon court looked to federal cases with approval and followed the latter approach. Id. at 734 ("`In applying the doctrine of subrogation, no attention should be paid to technicalities which are not of an insuperable character, but the broad equities should always be sought out so far as possible.'") (internal quotation marks omitted) (quoting Barnes v. Cady, 232 F. 318, 325 (6th Cir.1916)).
¶ 26 In their early mistrust of the doctrine, courts would not allow any lender with either actual or constructive knowledge to seek equitable subrogation. Most courts, however, realized it was senseless to adhere to this strict interpretation in many situations. Nevertheless, acceptance was incremental. And while many courts were quick to allow equitable subrogation for a plaintiff with constructive notice, some continued to deny those with actual knowledge.
¶ 27 As this incremental change persisted, many jurisdictions have adopted the Restatement approach. In E. Boston Sav. Bank, 701 N.E.2d at 335, the court, after reviewing the three possible applications, said: "We are persuaded by the reasoning of courts that not only allow subrogation where the subrogee has actual or constructive knowledge of the intervening mortgage, but also look to equity to decide if subrogation is inappropriate." In Bank of N.Y. v. Nally, 820 N.E.2d 644 (Ind.2005) the court accepted the Restatement's reasoning and said:
Precluding equitable subrogation when a mortgagee discovered or could have discovered a junior lien holder runs contrary to the purposes underlying the doctrine. Equitable subrogation is a remedy to avoid an unearned windfall.
. . . .
We agree with the Restatement at least in the context of a conventional refinancing. A lender providing funds to pay off an existing mortgage expects to receive the same security as the loan being paid off. Refinancings are common place in today's economy. Permitting a junior lienholder to leapfrog the priority of the current senior mortgage would impair the owner's access to more favorable interest rates. Unless a junior lienholder is disadvantaged by permitted subrogation, we see no reason to give the junior lienholder in effect the right to block or object to the refinancing.
Id. at 653; see also Bank of Am. Fed. Sav., 78 P.3d at 74 ("Because the Restatement approach is the most persuasive, we adopt the view expressed by it."); Lamb Excavation, Inc. v. Chase Manhattan Mortgage Corp., 208 Ariz. 478, 95 P.3d 542 (2004); Wilkins v. Gibson, 113 Ga. 31, 38 S.E. 374 (1901); Klotz v. Klotz, 440 N.W.2d 406 (Iowa Ct.App.1989); Burney, 63 S.W.3d 223; Providence Inst. for Sav. v. Sims, 441 S.W.2d 516 (Tex.1969); Farm Credit Bank v. Ogden, 886 S.W.2d 305 (Tex.App.1994); Chicago Title Ins. Co. v. Lawrence Invs., Inc., 782 S.W.2d 332 (Tex.App.1989); see also Trus Joist Corp., 190 N.J.Super. 168, 462 A.2d 603 (allowing subrogation even when the new mortgagee knew of the intervening interests), rev'd sub nom., Trus Joist Corp. v. Treetop Assocs., 97 N.J. 22, 477 A.2d 817 (1984); Martin, 59 P.2d at 1142-44; Hudson v. Dismukes, 77 Va. 242, 246-47 (1883).[11] This *26 trend is clearly toward the more liberal approach, and we would be wise to follow it.
¶ 28 Jurisdictions that continue to deny equitable subrogation when the plaintiff knows of intervening interests rely on cases discussing subrogation in the context of a mistake. Subrogation applies in many contexts, and while the overall purpose of preventing unjust enrichment is the same, many times the requirements will be tailored to the particular nuances of the situation.[12] Restitution is one such context. When a lender paid off another's debt mistakenly believing there were no intervening interests, he would then have to appeal for equitable relief.[13] Dicta stating a party cannot have knowledge of junior interests was in the context of ensuring there had been a genuine mistake. In a Maryland case, the court recited the following requirements for subrogation:
First, the lienholder seeking equitable subrogation must have taken the later lien without knowledge of the intervening lien and have intended the later lien to be of the same priority as the lien it replaced. Second, the negligence vel non of the lienholder requesting equitable subrogation in not discovering the intervening lien is not relevant, unless the intervening lienholder can show detrimental reliance.
Levenson v. G.E. Capital Mortgage Servs., Inc., 101 Md.App. 122, 131-32, 643 A.2d 505, 509-10 (1994) (citation omitted) (discussing Bennett v. Westfall, 186 Md. 148, 46 A.2d 358 (1946)), rev'd on other grounds, 338 Md. 227, 657 A.2d 1170 (1995). In Bennett, a lienholder released a prior mortgage and obtained a new mortgage against the debtor. In the interim, Bennett obtained a judgment against the debtor. Westfall, the lienholder, never discovered this judgment. Despite his carelessness, Westfall had intended to retain the same priority, and the court said he was entitled to equitable subrogation. But the court had to find Westfall had no knowledge of the intervening lien  otherwise his mistake argument necessarily fails and he could not seek restitution.[14]
¶ 29 But in the context of refinancing, where mistake is not at issue, there is no reason to consider the subrogree's knowledge.[15] In Levenson, G.E., a refinancing mortgagee, discovered intervening judgment liens before it began foreclosure proceedings against the property. The Maryland appeals court held G.E. Capital was entitled to equitable subrogation and extended it beyond Bennett to include refinancing mortgagees:
[T]he weight of authority extends the application of the doctrine of equitable subrogation *27 to situations in which the initial and refinancing lenders are not the same, provided the refinancing lender's money is intended to be used, and is used, to eliminate a specific encumbrance, and the refinancing lender intended "to get as security for his loan either the land free and clear of the encumbrance or else the benefit of the encumbrance itself" rather than rely upon the general creditor of the mortgagor. . . . We believe that such an extension is appropriate in view of modern lending practices, and we hold that the trial court did not abuse its discretion in holding that G.E. was entitled to be equitably subrogated to the First Federal lien.
Levenson, 101 Md.App. at 132-33, 643 A.2d 505 (citations omitted).[16] Similarly, the law in New York is: "where the funds of a mortgagee are used to satisfy the lien of an existing, known incumbrance [sic] when, unbeknown to the mortgagee, another lien on the property exists which is senior to his but junior to the one satisfied with his funds." King v. Pelkofski, 20 N.Y.2d 326, 333-34, 282 N.Y.S.2d 753, 229 N.E.2d 435, 439 (1967). But again this rule was made in the context of a mistake: "subrogation erases the lender's mistake in failing to discover intervening liens," United States v. Baran, 996 F.2d 25, 29 (2d Cir.1993), and does not implicate all applications of equitable subrogation.[17]
¶ 30 Restatement (Third) § 7.3 further illustrates how knowledge of intervening interests is irrelevant in the context of refinancing mortgages. Section 7.3 concerns mortgages, but instead of a new lender refinancing a first mortgage, it pertains to lenders renegotiating the same mortgage. This is a common practice. RESTATEMENT (THIRD) § 7.3 cmt. a. The Restatement notes the similarities between §§ 7.6 and 7.3. Restatement (Third) § 7.6 cmt. e, at 519. ("[Section 7.3] is analogous to subrogation, and under this Restatement the requirements are essentially similar to those for subrogation."). Both rules seek to protect "the legitimate expectations of the holders of junior interests, while at the same time denying them the ability to veto workouts or other flexible restructuring arrangements between mortgagors and senior lenders." RESTATEMENT (Third) § 7.3 cmt. a. It is common sense that the same lender should not lose priority for renegotiating a mortgage with the debtor. Why should it be any different when a new lender renegotiates that same mortgage? As long as the junior interests are not materially prejudiced, then equitable subrogation maintains the proper priorities.
¶ 31 When we are dealing with refinancing, as opposed to mistakes, there is no reason to consider the subrogee's knowledge of intervening interests. Rather, subrogation's overall purpose as a doctrine "`of equity and benevolence'" should guide our reasoning: "`its basis is the doing of complete, essential, and perfect justice between the parties, without regard to form, and its object is the prevention of injustice.'" Prestridge, 132 Miss. at 176, 95 So. at 838 (quoting Robinson v. Sullivan, 102 Miss. 581, 59 So. 846 (1912)).
*28 VI. Public Policy Supports Adopting the Restatement Approach
¶ 32 Finally, two policy considerations strongly support the Restatement's approach. First, by facilitating more refinancing, equitable subrogation helps stem the threat of foreclosure. An Iowa court recognized how important equitable subrogation is for homeowners. In Klotz v. Klotz, Roland Klotz owned a parcel of land that had a mortgage on it and a junior lien against it from his ex-wife, Germaine. Roland's mother, Nettie, paid the mortgage because the bank was threatening foreclosure. The court liberally applied equitable subrogation to prevent forfeiture: "There are particularly strong arguments in Iowa for allowing one, who at the contract purchaser's request pays off a vendor, to be subrogated to the vendor's position. This is especially true where there is a threat of forfeiture. By allowing subrogation there is an incentive for one to advance sums to help a property owner avoid forfeiture." Klotz, 440 N.W.2d at 410. It is in everyone's interest to prevent foreclosure.[18] Allowing subrogation protected both Roland's and Germaine's interests. "Had forfeiture occurred, Germaine would have lost her security. Forfeiture would have divested Roland of any interest in the property to which Germaine's interest could attach. . . . Germaine's lien became more secure and her judgment lien no longer was in jeopardy of being forfeited." Id. at 409 (citations omitted).
¶ 33 Second, the Restatement approach affords enormous financial benefits for many homeowners. A recent law review article explains how a liberal equitable subrogation doctrine can save billions of dollars by reducing title insurance premiums. Title insurance primarily ensures there are no intervening liens, and when a jurisdiction adopts the liberal view of equitable subrogation, the insurance premium is greatly reduced.[19] These savings eventually benefit homeowners because title insurance premiums are mostly passed on to them:
We have demonstrated that title insurance costs in residential mortgage refinancings represent billions of dollars annually  costs that are now borne overwhelmingly by homeowners. We have illustrated how adoption of the Restatement sections dealing with subrogation and related priority issues would virtually eliminate the risk of loss of mortgage priority for refinancing lenders.
. . . .
The potential savings quite literally amount to billions of dollars. Whether the change is accomplished by Congress or by incremental process of state adoption, it is vital that is occur before the next major decline in mortgage interest rates and the corresponding wave of mortgage refinancings. Economic efficiency in the marketplace, and the attendant savings for individual households, demands nothing less.
Nelson & Whitman, Adopting Restatement Mortgage Subrogation Principles, supra, at 365-66.
¶ 34 Bank of America asks us to apply an antiquated requirement that bears no rational relationship to equitable subrogation's overall purpose or its function in the refinancing context. Equitable subrogation is a broad doctrine and should be followed whenever justice demands it and where there is no material prejudice to junior interest. A liberal approach is in line with the doctrine's *29 equitable rationale and is becoming the more accepted rule, in no small part because of the immense benefits it holds for homeowners. Bank of America offers no principled reason why it should receive an unearned windfall at WFB West's expense.
¶ 35 We adopt § 7.6 of the Restatement (Third) and hold WFB West is equitably subrogated to Washington Mutual's first-priority lien, regardless of either its actual or constructive knowledge of intervening interests.
WE CONCUR: TOM CHAMBERS, BARBARA A. MADSEN, MARY E. FAIRHURST, JAMES M. JOHNSON and BOBBE J. BRIDGE, JJ.
OWENS, J. (dissenting).
¶ 36 The majority holds that a lender can be equitably subrogated to a first-priority lien even though the lender has actual or constructive knowledge of junior lienholders. I would hold that Wells Fargo Bank West's (WFB West) actual knowledge of Bank of America's (BoA) lien bars application of the doctrine of equitable subrogation. Thus, I respectfully dissent.
¶ 37 Washington's recording statute, RCW 65.08.070, modified "the common law rule of `first in time, first in right,'" which gives priority to the first interest in real property created. 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 18.21, at 342 (2d ed.2004). Under RCW 65.08.070, a deed of trust's recording date generally governs the priority of competing liens on the same real property. A security interest that is recorded first, even though it was created second in time, will be given priority over the earlier unrecorded interest if the second lienholder has no knowledge of the prior lien. By generally giving priority to the first recorded lien, the recording statute promotes predictability in the resolution of competing security interests in the same real property. However, the statute protects only "good faith" mortgagees, since it prevents a second lienholder who records first from vaulting into the first-priority lien position if that second lienholder has actual knowledge of the preexisting unrecorded lien. RCW 65.08.070. The recording statute thus makes constructive or actual knowledge determinative: just as a lien that is recorded second in time cannot take precedence over the prior recorded lien (since the first lienholder's recording gives the second lienholder constructive knowledge of the preexisting recorded lien), a second lienholder who has actual knowledge of the prior unrecorded lien cannot move up in priority simply by beating the first lienholder to the county auditor's office.
¶ 38 In the present case, the majority adopts without qualification the doctrine of equitable subrogation set forth in section 7.6 (and comment e) of the Restatement (Third) of Property: Mortgages (1997) [hereinafter Restatement (Third)]. This approach allows refinancing mortgagee WFB West to move into the first-priority lien position of the original mortgagee, Washington Mutual Savings Bank, even though WFB West had actual knowledge of BoA's and Wells Fargo Bank's[1] intervening liens on the property. Of the three possible approaches to the knowledge issue, the unqualified Restatement (Third) approach is the most advantageous to any refinancing mortgagee, since it permits equitable subrogation despite the refinancing lender's constructive or actual knowledge of intervening liens. It is the only approach that benefits WFB West in the present case and the least consistent approach with our prior case law and the recording statute.
¶ 39 I would decline to adopt the doctrine of equitable subrogation set forth in section 7.6 and comment e of the Restatement (Third) and would instead adopt "the traditional (and still majority) rule," which "allows subrogation with constructive knowledge, but not with actual knowledge." Pet. for Review at 11; Pet'r's Suppl. Br. at 9. While this approach is admittedly an exception to the recording act (since the refinancing lender moves ahead of a previously recorded lien), the "actual knowledge" bar to equitable subrogation nevertheless harmonizes to some extent with the recording act's provision that a subsequent lienor may not take precedence *30 over a prior unrecorded lien of which the subsequent lienor has actual knowledge. RCW 65.08.070. As the Restatement (Third) acknowledges, "[m]ost of the cases disqualify [from equitable subrogation] the payor who has actual knowledge of the intervening interest." Restatement (Third) § 7.6 cmt. e, at 519-20; see, e.g., First Union Nat'l Bank v. Nelkin, 354 N.J.Super. 557, 808 A.2d 856 (2002); Dimeo v. Gesik, 164 Or.App. 567, 993 P.2d 183 (1999), adhered to as modified on recons., 197 Or.App. 560, 106 P.3d 697 (2005).
¶ 40 The traditional approach is consistent with the recording statute's interest in withholding benefits from a lienholder who has actual knowledge of a prior lien. In my view, a refinancing mortgagee who has actual knowledge of an intervening lien yet fails to take protective measures would be hard pressed to prove that it "reasonably expected" to assume a first-priority lien position. RESTATEMENT (THIRD) § 7.6(b)(4), at 508; see PATRICK J. ROHAN, 4C-3H REAL ESTATE FINANCING § 3H.09[3] (2006) (observing that "[c]ommercial lenders can examine the property, ask questions about the existence of intervening lienholders, acquire subordination agreements with any existing lienholders, or, in many cases, assume the earlier lender's rights through assignment"); see also BNC Mortgage, Inc. v. Tax Pros, Inc., 111 Wash.App. 238, 256, 46 P.3d 812 (2002).
¶ 41 The majority's assumption that, under the traditional approach, "mortgage companies could purposefully remain ignorant of intervening interests" is misplaced. Majority at 24. Here again, in my view a commercial lender who undertakes no title search will be unable to demonstrate, as the Restatement (Third) requires, that it "reasonably expected to receive a security interest in the real estate with the priority of the mortgage being discharged." RESTATEMENT (THIRD) § 7.6(b)(4), at 508 (emphasis added). I see no difficulty in distinguishing between, on the one hand, the wishful thinking of a lender who eschews a title search and, on the other hand, the reasonable expectations of a lender who arranges for a search of the relevant property records.
¶ 42 Further, making the refinancing mortgagee's actual knowledge of the intervening lien a bar to equitable subrogation is more consistent with our holding in Hu Hyun Kim v. Lee, 145 Wash.2d 79, 31 P.3d 665, 43 P.3d 1222 (2001). The issue in Kim was whether a refinancing mortgagee's title insurer should benefit from equitable subrogation if the insurer had constructive and actual knowledge of a judgment creditor's intervening lien. The Kim court held that "[a] title insurer should not avoid liability through the doctrine of equitable subrogation because the title insurer had actual knowledge of a prior judgment lien and failed to disclose such a lien to its insured before issuance of the title policy." Id. at 82, 31 P.3d 665. Although Kim is not, as the Court of Appeals in this case stated, "controlling precedent," the holding certainly marked our disapproval of the notion that subrogation should be permitted "`even if the payor had actual knowledge of the intervening interest.'" Id. at 90, 31 P.3d 665 (quoting RESTATEMENT (THIRD) § 7.6 cmt. e, at 520).
¶ 43 Thus, I would hold that actual knowledge of a prior lien bars application of the doctrine of equitable subrogation. Such a holding is most consistent with the principle in the recording statute that a lien created second in time will have first priority if it is recorded first and is likewise most consistent with our prior case law. Accordingly, I would hold that WFB West's actual knowledge of BoA's lien bars the unqualified application of the doctrine of equitable subrogation set forth in section 7.6 of the Restatement (Third) and affirm the Court of Appeals.
WE CONCUR: GERRY L. ALEXANDER, C.J., and CHARLES W. JOHNSON, J.
NOTES
[1] "[A] deed that contains or is accompanied by an agreement that it shall be canceled or the land reconveyed upon payment of a debt is a mortgage." 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 20.2, at 405 (2d ed.2004).
[2] In November 2001 Sugihara received a $500,000 home equity loan from Wells Fargo Bank (WFB). Part of that loan was used to pay Bank of America for its original $400,000 loan to Prestance Corporation. Bank of America cashed the check but never reconveyed the deed of trust to WFB.
[3] Courts adopted equitable subrogation from civil law. See Martin v. Hickenlooper, 90 Utah 150, 155, 59 P.2d 1139 (1936).
[4] If the first-priority mortgagee forecloses, then a second-priority mortgagee knows he can recover any surplus remaining only after the first-priority mortgagee has been fully satisfied. Therefore, second-priority mortgages often include terms to help alleviate this risk, such as higher interest rates. It is unfair then to allow a second-priority mortgagee to take a first-priority but still enforce the previously bargained-for terms. He gains the security of a first-priority loan, while keeping the favorable conditions of a second-priority loan.
[5] It is not clear whether a majority of jurisdictions still require a plaintiff not have actual knowledge of intervening interests. Since the Restatement's publication in 1997, numerous jurisdictions have adopted it. See discussion, infra, note 7.
[6] To be eligible for equitable subrogation under the Restatement the lender must show it expected to receive a first priority and no junior lender will be materially prejudiced. See RESTATEMENT (THIRD) § 7.6 cmts. e, f, at 519, 522.
[7] There are conflicting decisions in some jurisdictions that purport to follow the "majority" rule. In Picker Financial Group, a United States District Court could not determine the state of the law: "It is confusing whether Florida has adopted the pure liberal view giving no regard to notice, or perhaps a mixed view which liberalizes the traditional view but still bars equitable subrogation when a lender fails to help himself by checking the record." Picker Fin. Group L.L.C. v. Horizon Bank, 293 B.R. 253, 258-59 (Bankr. M.D.Fla.2003). Similarly, Missouri, which had been so hostile to the doctrine in Bunn, accepted a more liberal view in Anison v. Rice, 282 S.W.2d 497 (Mo.1955), returned once again to its traditional view in Thompson v. Chase Manhattan Mortgage Corp., 90 S.W.3d 194, 207 (Mo.Ct.App. 2002) and now accepts the Restatement approach in Burney v. McLaughlin, 63 S.W.3d 223, 231 (Mo.Ct.App.2001) ("[O]nly in a rare number of cases . . . where the paramount mortgage has substantially impaired the security interest of the junior mortgage, are the priorities rearranged." (citations omitted)). Tennessee still looks to see whether the subrogee had actual knowledge, but does not necessarily bar subrogation if the subrogee had such knowledge. Assocs. Home Equity Servs., Inc. v. Franklin Nat'l Bank, No. M2000-00516-COA-R3-CV, 2002 WL 459007, at *7, 2002 Tenn.App. LEXIS 207, at *22 (Tenn.Ct.App. Mar.26, 2002) ("Whether or not actual knowledge is a per se bar to subrogation, we are not persuaded that a party's actual knowledge is irrelevant to the question of whether the equitable remedy of subrogation should be granted."). California purports to require actual knowledge but says subrogation is appropriate "whenever `one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter.'" Han v. United States, 944 F.2d 526, 529 (9th Cir.1991) (quoting Caito v. United Cal. Bank, 20 Cal.3d 694, 704, 144 Cal.Rptr. 751, 576 P.2d 466, 471 (1978)). And it is "'not a fixed and inflexible rule of law or of equity. It is not static, but is sufficiently elastic to take within its remedy cases of first instance which fairly fall within it.'" Id. at 529 (quoting In re Estate of Johnson, 240 Cal.App.2d 742, 744-45, 50 Cal.Rptr. 147, 149 (1966)). In Mort, the Ninth Circuit looked to California law to find subrogation is "a broad equitable remedy" and may apply where one or more of these factors are absent. Mort v. United States, 86 F.3d 890, 894 (9th Cir.1996).
[8] Creating distinctions between constructive notice and actual knowledge is dangerous; the recording act demands constructive knowledge be tantamount to actual knowledge. Otherwise why should one bother investigating the records before acquiring a new mortgage if his ignorance  no matter how willful  could possibly behoove him?
[9] Courts apply equitable doctrines even when the conflict with recording acts or other priority schemes, such as those established by the Uniform Commercial Code. In another California appeals court case, the court recognized that article 9 provided necessary stability and predictability, but it held principles of equity still applied. Specifically, the court said: "[W]hen a party possessing a security interest in a crop and its proceeds has knowledge of and acquiesces in expenditures made which are necessary to the development of the crop, and ultimately benefits from the expenditures, a party who, through mistake, pays such costs without first obtaining subordination, is entitled to recover." Producers Cotton Oil Co. v. Amstar Corp., 197 Cal.App.3d 638, 660, 242 Cal.Rptr. 914, 927 (1988), see also Ninth Dist. Prod. Credit Ass'n v. Ed Duggan, Inc., 821 P.2d 788, 795, 798 (Colo.1991) (stating that there is "obvious tension between the doctrine of unjust enrichment and the priority system established by Article 9" but "[t]he equitable claim is at its strongest when the goods or services are necessary to preserve the security").
[10] The Martin court accepted the liberal view, allowing subrogation unless the intervening interests suffer some prejudice:

It does not appear to us important from the standpoint of subrogation to fasten on one view or the other [concerning actual or constructive knowledge]. If it is true that negligence in searching the record or lack of due care is not a hindrance to subrogation, the doctrine of constructive notice would seem to be quite immaterial. . . . It may be puzzling to understand why in cases of conventional subrogation carelessness has any part whatsoever. If subrogation depends upon an implied or express agreement to subrogate, what boots it whether or no the lender had notice of subsequent liens? He may be quite cognizant of the whole record, and yet if his right to be substituted for another depends upon an agreement to subrogate  which in equity is to be treated, upon his lending the money, as if an assignment of the creditor's lien had been made to him  his failure to look up the record would be no more material than if he had actually taken an assignment.
Martin, 59 P.2d at 1143.
[11] Other courts have indicated they are persuaded by the Restatement's approach, but declined to clearly articulate a rule adopting the Restatement approach because the issue was not directly before it. E. Sav. Bank v. Pappas, 829 A.2d 953, 959 n. 11 (D.C.2003); Ameriquest Mortgage Co. v. Alton, 271 Mich.App. 660, 668, 682, 726 N.W.2d 424 (2006) (stating "the Restatement rule is the better view. . . . A contrary result would bestow an unsupportable windfall on [the defendant], unjustly enriching him" but declining to "decide whether to follow the majority rule or the Restatement" in regard to actual knowledge of intervening interests), vacated in part on other grounds by 271 Mich.App. 801, 726 N.W.2d 424 (2006). Other intermediate courts have expressed approval of the Restatement approach but declined to apply it because they considered themselves bound by stare decisis. See Ripley v. Piehl, 700 N.W.2d 540, 547-48 (Minn.Ct.App. 2005); Heller, 863 A.2d at 1157-58 ("While we find the logic of the Restatement to be compelling and very persuasive, we are bound by principles of stare decisis and accordingly, must find the trial court properly determined appellant is not entitled to the remedy of equitable subrogation.").
[12] Equitable subrogation is also frequently applied in insurance, surety, and construction cases.
[13] In these situations, restitution applies when there is some intervening cause that makes a resulting transfer of money unjust. See RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 1 cmt. d at 12 (Discussion Draft, Mar. 31, 2000) ("This division of the law of restitution deals with cases in which a transfer is denied conclusive effect against the transferor because it has been induced by mistake, fraud, duress, or other invalidating cause.").
[14] See note 10, supra, discussing how restitution could apply only if there were some mistake, fraud, or duress.
[15] There are few, if any, early cases discussing equitable subrogation in the context of refinancing since refinancing has become more popular only recently. The Martin court noted how requirements of equitable subrogation in one context can differ from that of another: "Yet courts have striven to lay down rules of guidance to govern courts of equity in applying the doctrine, but these rules are largely a codification of principles stated in the cases and have themselves changed as the courts applied the doctrine to new sets of facts and gave it broader interpretation." Martin, 59 P.2d at 1141.
[16] The Maryland Court of Appeals quotes from a real estate treatise and says: "One who `advances money to discharge a prior lien in reliance upon getting a first mortgage . . . is entitled to subrogation to the prior lien as against the holder of an intervening lien of which he was ignorant.'" Levenson, 101 Md.App. 122, 643 A.2d 505 (quoting GEORGE E. OSBORNE, MORTGAGES § 282, at 571 (2d ed.1970)). This quote also relates to a mistake context and does not vitiate the fact that the court extended subrogation to a refinancing context.
[17] Similarly, the California case of Smith v. State Savings & Loan Ass'n, 175 Cal.App.3d 1092, 1098, 223 Cal.Rptr. 298, 301 (1985), is often cited as authority for the majority approach. While the case does say, "equitable subrogation will be denied to a new lender who has actual knowledge of the junior encumbrance," it relies on cases that state this rule as dicta in the context of a lender's mistake in failing to find intervening interests. See id. at 1098, 223 Cal. Rptr. 298 (citing Shaffer v. McCloskey 101 Cal. 576, 580-581, 36 P. 196 (1894); Darrough v. Herbert Kraft Co. Bank, 125 Cal. 272, 275, 57 P. 983 (1899)). Both cases allowed subrogation to cure the subrogee's mistake. See Shaffer, 101 Cal. at 581, 36 P. at 197 ("[W]hen the legal rights of parties have been changed by mistake, equity restores them to their former conditions when it can be done without interfering with any new rights acquired on the faith and strength of the altered condition of the legal rights, and without doing injustice to other persons." (internal quotations omitted)); Darrough, 125 Cal. at 275, 57 P. 983.
[18] There is no guarantee the junior lienholder will fully realize on its interest. When a mortgage is foreclosed, then any sales surplus is equitably distributed to any junior interest through the equity action of redemption. All junior interests are then extinguished, even if there are insufficient funds to satisfy them. Therefore, it is often in the best interest of the junior interest to make the collateral more secure, but as Klotz shows, sometimes junior lienholders are not always willing to accept work-arounds between the mortgagor and refinancing lenders.
[19] Lest anyone fear for the future of the title insurance industry, Professors Nelson and Whitman assure us "the title insurance industry can endure a significant reduction in refinance premiums." Nelson & Whitman, Adopting Restatement Mortgage Subrogation Principles, supra, at 359. Additionally, Nelson and Whitman spoke with "a variety of executives representing major title insurance companies and mortgage lenders from all geographic areas of the country. . . . Their comments were unanimous in one important respect  they supported either judicial or legislative adoption of the Restatement subrogation rule." Id. at 353 (footnote omitted).
[1] Wells Fargo Bank and WFB West are separately chartered national banking associations.