[No. 41470-8-II.   Division Two.   February 22, 2012.]

COLUMBIA COMMUNITY BANK, *Respondent*, v. NEWMAN PARK, LLC, *Appellant*.

*Ben Shafton*, for appellant.

*Thomas F. Peterson* and *Adam R. Asher* (of *Socius Law Group PLLC*), for respondent.

¶1 ARMSTRONG, J. — Joseph Sturtevant borrowed money from Columbia Community Bank, providing collateral with a deed of trust for the Newman Park LLC property. To ensure a first priority position, Columbia paid off Newman

Park's existing loan from another bank, Hometown National Bank, and delinquent property taxes on Newman Park's property. When Sturtevant defaulted on the loan, Columbia learned that he might not have had authority from Newman Park to obtain the loan. Columbia then sued Newman Park to enforce the loan security agreement or, in the alternative, to be equitably subrogated to Hometown's loan to Newman Park.

¶2 On summary judgment, the trial court denied Columbia's claim that Newman Park was liable for the loan Sturtevant had obtained, but the court held that to prevent unjust enrichment, Newman Park was liable for the amount Columbia paid on the Hometown loan and the delinquent property taxes. Both parties appeal. Columbia argues that issues of material fact exist as to whether Sturtevant had actual or apparent authority to obtain the Columbia loan. Newman Park argues that the trial court erred by subrogating Columbia to Hometown's loan because Columbia acted as a "volunteer" in making its loan. Finding no error, we affirm.

## FACTS

¶3 In October 2004, Sturtevant submitted an application for an employer identification number on behalf of Newman Park to the secretary of state. He signed the application "Joseph Sturtevant, Managing Member." Clerk's Papers (CP) at 662. On October 18, Sturtevant also applied to form a limited liability company (LLC) with the state. Newman Park is a manager-managed LLC.[1]

¶4 Newman Park has 12 investor-members, including Landmark Development Ventures Inc., Brian and Maya

---

[1] A limited liability company is member-managed unless the operating agreement expressly provides that it is "manager-managed." RCW 25.15.150. "Manager-managed" is a term of art referring to the choice to have the manager exclusively decide the company's activities. UNIF. LTD. LIAB. CO. ACT (1996), § 203(a)(6), 6B U.L.A. 545, 575-76 (2008); UNIF. LTD. LIAB. CO. ACT (2006), § 407(a), 6B U.L.A. 407, 483.

Allen, Rick and Christine Goode, William Lowry, Kurt and Susan Rylander, Jim and Jean Schroeder, and Jeff and Kathleen Sunshine. All the investor-members had invested with Sturtevant before. Sturtevant is not, individually, an LLC member.

¶5 Landmark initially owned 39 percent of Newman Park; the other members owned 61 percent. Sturtevant is the sole shareholder, director, and officer of Landmark.

### I. Newman Park Operating Agreement

¶6 Newman Park's operating agreement identifies Sturtevant as the "manager" and "managing member." CP at 471, 475. In annual reports submitted to the secretary of state, Sturtevant also referred to himself as "manager," and once as "managing member." CP at 128-35. The operating agreement does not list Sturtevant as an LLC member; instead, Sturtevant has only an indirect membership interest through Landmark. The operating agreement provides, in relevant part:

> 1.3 **Nature of Business.** The LLC shall acquire, own, develop, sell and complete a residential subdivision project known as Newman Park situated in Olympia, Thurston County[,] Washington, known as follows:
>
> 3822 Wiggins Road SE (Tax Parcel 11829330300)
>
> Member Joseph Sturtevant is 100% responsible for satisfactory real estate development and project completion.

CP at 649.

¶7 The operating agreement limits the power of members to borrow money or encumber company property; no member can (1) incur liability greater than $25,000; (2) pledge company property to secure a loan over $50,000; or (3) refinance any obligation leading to aggregate indebtedness of over $50,000.

## II. Newman Park Property

¶8 In December 2004, Newman Park purchased real property in Thurston County for $500,000. Newman Park financed the purchase with a $393,100 loan from Hometown. Sturtevant provided Hometown with copies of Newman Park's application to form an LLC, the certificate of formation, and the operating agreement. Newman Park granted Hometown a deed of trust on the property. The deed to Hometown was executed on Newman Park's behalf and signed, "Landmark Development Ventures, Inc., Manager of Newman Park LLC By: Joseph A. Sturtevant, President of Landmark Development Ventures, Inc." CP at 670-77.

¶9 Sturtevant also executed a real estate tax affidavit, settlement statement, and closing instructions on Newman Park's behalf, signing each document as "Joseph Sturtevant, President of Landmark Development Ventures, Inc., Managing Member." CP at 85-87, 91, 93, 679. He signed the promissory note as "Landmark Development Ventures, Inc. Manager of Newman Park LLC By: Joseph A. Sturtevant, President of Landmark Development Ventures, Inc." CP at 699. In contrast, Sturtevant signed the "Limited Liability Company Resolution to Borrow/Grant Collateral" as "Joseph A. Sturtevant, Manager of Newman Park LLC." CP at 694.

¶10 On February 21, 2005, Sturtevant e-mailed to the investors copies of the LLC formation application, the certificate of formation, the final closing HUD (Housing and Urban Development) papers, the deed transferring title to Newman Park, and the deed of trust to Hometown. No member objected to the documents.

## III. Columbia Community Bank Loan to Trinity Development-Northwest LLC

¶11 Sturtevant formed Trinity Development-Northwest LLC in October 2007. Sturtevant holds a 95 percent interest in Trinity, and Robert Leach holds a 5 percent interest.

¶12 In January 2008, Sturtevant sought a loan for Trinity from Columbia. When Sturtevant met with Bradley Volchok, the assistant vice president of Columbia, to discuss the loan, he told Volchok that Landmark was the sole member or owner of Newman Park.

¶13 On February 1, Columbia sent Sturtevant a commitment letter offering to lend Trinity between $1,500,000 and $2,500,000 as a revolving line of credit. The loan amount depended on whether Columbia paid off Hometown's loan for the Newman Park property and whether the loan was secured both by sufficient real estate and a $1,000,000 certificate of deposit.

¶14 The loan commitment letter explained that the loan was to "[p]rovide liquidity for real estate investments and development projects," but it did not specify a project. CP at 288, 297. The bank included one contingency in the letter:

[A] new appraisal for the Newman Park property and an updated appraisal of Joe Sturtevant's personal residence, both to be reviewed and accepted by Columbia Community Bank. The loan officer will visit both sites as well.

CP at 299.

¶15 The commitment letter limited the loan to 65 percent of Newman Park's property's appraised value together with 80 percent of the appraised value of Sturtevant's personal residence. Further, the commitment letter stated:

Additionally, we would appreciate the opportunity for the deposit relationship with Landmark Development Ventures, Inc. and other entities, plus your personal deposit relationship.

CP at 290.

¶16 Sturtevant signed and returned the letter to Columbia accepting a loan of $1,500,000 without the $1,000,000 certificate of deposit as additional collateral.

¶17 On February 22, Sturtevant sent Columbia an altered copy of Newman Park's operating agreement, which stated that Landmark owned 100 percent of Newman Park.

In addition, Sturtevant provided Columbia with (1) the Newman Park certificate of formation; (2) Newman Park's application to form a limited liability company; (3) a Limited Liability Company Resolution to Borrow/Grant Collateral on Trinity's behalf that Sturtevant signed as "Managing Member of Trinity"; and (4) a "Corporate Resolution to Grant Collateral/Guarantee," also on Trinity's behalf that Sturtevant signed as "President/Secretary of Landmark." CP at 343-44, 346. Sturtevant provided Columbia with Trinity's certificate of formation and operating agreement, along with Landmark's certificate of incorporation, bylaws, and corporate resolutions.

## IV. DEED OF TRUST

¶18 On February 28, Sturtevant executed a promissory note for $1,500,000 to Columbia on Trinity's behalf. The promissory note required payment of all interest and principal by February 28, 2009. The collateral instrument pledged the Newman Park property as security for the Trinity loan by granting Columbia a deed of trust. Sturtevant signed the deed of trust as follows:

Grantor:

Newman Park, LLC

Landmark Development Ventures, Inc., member of Newman Park, LLC

By: Joseph A. Sturtevant, President/Secretary of Landmark Development Ventures, Inc.

CP at 208.

## V. DEFAULT

¶19 Columbia paid off the entire Hometown loan and delinquent property taxes on the Newman Park property when it made the loan to Trinity. The Newman Park members discovered the transaction in June 2009. At that

time, the members also discovered that Sturtevant had presented an altered operating agreement to Columbia.

¶20 Trinity defaulted on the loan. When Columbia attempted to foreclose on its deed of trust, it learned about possible problems with Sturtevant's authority to obtain the loan.

¶21 Columbia filed a complaint for declaratory judgment, equitable subrogation, and unjust enrichment. It sought a declaration that its deed of trust on Newman Park's property was valid and enforceable. In the alternative, it sought a lien on the Newman Park property under the doctrines of equitable subrogation and unjust enrichment. Newman Park filed a complaint, seeking a declaration that the deed of trust was invalid and unenforceable. The actions were consolidated.

¶22 Newman Park moved for summary judgment, arguing that the deed of trust securing Trinity's loan was invalid and unenforceable because Landmark had neither actual nor apparent authority to sign the documents. The trial court granted the motion, ruling that Newman Park's operating agreement unambiguously named Sturtevant as its manager and that Landmark had no actual authority to pledge Newman Park's property as security. The court also concluded that Columbia's apparent authority claim failed because Columbia required a resolution in order to confirm authority for the loan.

¶23 Columbia then moved for partial summary judgment to establish a lien on the Newman Park property through equitable subrogation or unjust enrichment. The trial court granted the motion, awarding the bank an equitable lien and judgment in the amount of $491,037.31, plus interest. Newman Park moved for attorney fees, which the trial court denied because both parties had prevailed on substantive issues.

¶24 Newman Park appeals the trial court's partial summary judgment for Columbia on its unjust enrichment and

equitable subrogation claims. Columbia cross appeals the trial court's grant of summary judgment determining the deed was invalid.

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

¶25 We review a trial court's grant of summary judgment de novo. *Fitzpatrick v. Okanogan County*, 169 Wn.2d 598, 605, 238 P.3d 1129 (2010). A court may grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. CR 56(c). In reviewing a summary judgment, we view " 'all facts and inferences in the light most favorable to the nonmoving party.' " *Fitzpatrick*, 169 Wn.2d at 605 (quoting *Biggers v. City of Bainbridge Island*, 162 Wn.2d 683, 693, 169 P.3d 14 (2007)).

¶26 Summary judgment is subject to a burden-shifting scheme. The moving party is entitled to summary judgment if it submits affidavits establishing it is entitled to judgment as a matter of law. *See Meyer v. Univ. of Wash.*, 105 Wn.2d 847, 852, 719 P.2d 98 (1986). The nonmoving party avoids summary judgment when it "set[s] forth specific facts which sufficiently rebut the moving party's contentions and disclose the existence of a genuine issue as to a material fact." *Meyer*, 105 Wn.2d at 852. Thus, the nonmoving party may not rely on speculative or argumentative assertions that unresolved factual issues remain. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986).

### II. EQUITABLE SUBROGATION

¶27 Newman Park argues that the trial court erred in granting Columbia summary judgment on the basis of

equitable subrogation. Newman Park contends that equitable subrogation does not apply because Washington law limits equitable subrogation in this context to mortgagees competing for priority and Columbia is not a priority creditor. Further, according to Newman Park, Columbia is not entitled to relief because it volunteered to make the loan.

¶28 The Washington Supreme Court recently adopted *Restatement (Third) of Property: Mortgages* § 7.6(a) (1997), which describes equitable subrogation as

[o]ne who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment. Even though the performance would otherwise discharge the obligation and the mortgage, they are preserved and the mortgage retains its priority in the hands of the subrogee.

¶29 Subrogation is appropriate to prevent unjust enrichment if the person seeking subrogation performs an obligation under the following circumstances:

"(1) in order to protect his or her interest;

"(2) under a legal duty to do so;

"(3) on account of misrepresentation, mistake, duress, undue influence, deceit, or other similar imposition; or

"(4) upon a request from the obligor or the obligor's successor to do so, if the person performing was promised repayment and reasonably expected to receive a security interest in the real estate with the priority of the mortgage being discharged, and if subrogation will not materially prejudice the holders of intervening interests in the real estate."

*BNC Mortg., Inc. v. Tax Pros, Inc.*, 111 Wn. App. 238, 255-56, 46 P.3d 812 (2002) (quoting RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 7.6(b)).

¶30 One purpose of equitable subrogation is to preserve the proper priorities by allowing a mortgagee who satisfies another mortgagee's loan to take that mortgagee's

priority position. *Bank of Am., NA v. Prestance Corp.*, 160 Wn.2d 560, 564-65, 160 P.3d 17 (2007). But the doctrine of equitable subrogation is an equitable remedy that generally applies " 'to avoid a person's receiving an unearned windfall at the expense of another.' " *Bank of Am.*, 160 Wn.2d at 567 (quoting RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 7.6 cmt. a). And equitable subrogation may arise when one pays or performs in full an obligation owed by another and secured by a mortgage. RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 7.6 cmt. a.

¶31 Newman Park argues that equitable subrogation does not apply because this is not a creditors' priority dispute. Newman Park focuses on the reference to "priorities" in chapter 7's title to support its argument. Appellant's Reply Br. at 31. But the *Restatement*'s general discussion of equitable subrogation and the following example demonstrate that equitable subrogation applies more broadly than to just setting priorities:

> 28. Blackacre is owned by A and B, subject to a mortgage held by Mortgagee-1 securing a debt of $100,000. A and B are tenants in common. A approaches Mortgagee-2 and induces it to make a loan of $150,000, of which $100,000 is used to pay off the first mortgage in full. The remaining $50,000 is used by A for other purposes. B is not a party to this transaction, but A forges B's name on the note and mortgage to Mortgagee-2. Mortgagee-2 is subrogated to the first mortgage to the extent of $100,000, and can enforce it against B's interest in Blackacre. Mortgagee-2 is not entitled to subrogation with respect to the remaining $50,000.

RESTATEMENT § 7.6 cmt. e, illus. 28.

¶32 This example illustrates that equitable subrogation applies even when a mortgagee pays off the only existing mortgage and the question is not one of priorities but whether the new mortgagee steps into the shoes of the paid-off mortgagee. Moreover, the example is similar to the facts here, where one person encumbers the property of another but without authority to do so and misuses some of

the loan proceeds; the question then is whether the remaining owner should be enriched by getting the property debt free.

¶33 When Columbia made its loan, Hometown held a deed of trust on the Newman Park property. To become the first lien holder, Columbia paid Newman Park's loan from Hometown. Because it fully performed Newman Park's obligation to Hometown, Columbia is equitably subrogated to the amount it paid. To hold otherwise would give Newman Park a windfall.

Volunteer Rule

¶34 Newman Park further argues that equitable subrogation does not apply because Columbia was a volunteer.

¶35 Previously, we recognized the volunteer rule in the context of a commercial loan. *BNC Mortg., Inc.*, 111 Wn. App. at 254. After our decision in *BNC Mortgage, Inc.*, 111 Wn. App. 238, the Washington Supreme Court considered the volunteer rule in *Bank of America*, 160 Wn.2d 560. In *Bank of America*, the court held that equitable subrogation was available in the refinance context and, as previously discussed, adopted *Restatement (Third) of Property Mortgages* § 7.6, which rejects the "volunteer" rule. *Bank of Am.*, 160 Wn.2d at 560-64. And our Supreme Court did not limit its adoption of the *Restatement* or attempt to preserve the volunteer rule. We now conclude that the volunteer rule is no longer a defense where a mortgagee pays off another mortgage holder. We therefore affirm the order granting partial summary judgment to Columbia on the basis of equitable subrogation.

¶36 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder

shall be filed for public record in accordance with RCW
2.06.040, it is so ordered.

HUNT and JOHANSON, JJ., concur.

Review granted at 174 Wn.2d 1020 (2012).