AMERIQUEST MORTGAGE COMPANY,
a Delaware corporation, Plaintiff–
Appellee,

v.

LAND TITLE INSURANCE CORPORA-
TION, a Colorado corporation, and Title
Acquisitions, Inc., a Colorado corpora-
tion, Defendants–Appellants.

No. 06CA0847.

Colorado Court of Appeals,
Div. II.

July 26, 2007.

As Modified on Denial of Rehearing
Oct. 4, 2007.

Certiorari Granted Aug. 4, 2008.

Dill, Dill, Carr, Stonbraker, & Hutchings, PC, John J. Coates, Denver, Colorado, for Plaintiff–Appellee.

Hamil–Hecht, LLC, J. Lawrence Hamil, Katherine J. MacKenzie, Denver, Colorado, for Defendants–Appellants.

Opinion by Judge ROTHENBERG.

This case arises out of the foreclosure and sale of real property. Defendants, Land Title Insurance Corporation (Land Title) and its related entity, Title Acquisitions, Inc. (Acquisitions), appeal the trial court's judgment in favor of plaintiff, Ameriquest Mortgage Company (Ameriquest), on its claims for equitable subrogation and to quiet title under C.R.C.P. 105. We affirm.

## I. Background

The parties submitted this case to the trial court on the following stipulated facts. Ronald Battles and Jacqueline Battles (Battleses) were the owners of real property in Englewood, Colorado. On June 24, 1986, they granted to Home Savings of America a deed of trust in the property. It was recorded on July 1, 1986 and later assigned to Washington Mutual Bank.

On July 3, 1995, the Battleses granted a deed of trust to First Bank of South Dakota to secure their loan obligation under an equity line of credit. The First Bank deed of trust was recorded on July 28, 1995, and the indebtedness was to mature on July 3, 2000. The First Bank deed of trust was then transferred to U.S. Bank and later acquired by Land Title (First Bank/Land Title deed of trust).

On February 2, 2001, the Battleses granted the CIT Group/Consumer Finance Inc. a deed of trust (CIT deed of trust) on the

property to secure a $200,000 loan, and that deed of trust was recorded on February 13, 2001.

In November 2002, the Battleses and Land Title entered into a modification agreement confirming that the Battleses' obligation under the First Bank/Land Title deed of trust was $136,797.20, plus interest, late charges, attorney fees, and other charges until paid in full. The modification agreement provided that the First Bank/Land Title deed of trust would be subordinated to the November 12, 2002, deed of trust against the property in the amount of $260,000 made by RE Services Limited Liability Company (RE Services deed of trust). The RE Services deed of trust was recorded on November 13, 2002, and the proceeds were used to pay off the CIT deed of trust.

In February 2003, the Battleses were informed that they were in default under the note secured by the First Bank/Land Title deed of trust, and that $142,959.40 was due immediately. The Battleses had also stopped making payments on the note securing the RE Services deed of trust. On March 25, 2003, RE Services instituted foreclosure proceedings, and in May 2003, Land Title was assigned the RE Services deed of trust and received payment from a third-party bidder at the foreclosure sale.

While the RE Services deed of trust foreclosure proceedings were pending, the Battleses applied for a $550,000 loan from Ameriquest to be secured by a deed of trust. Before approving the loan, Ameriquest retained Northwest Title and Escrow Corporation (Northwest Title) to close the loan and issue a title insurance policy. The Ameriquest loan required that all prior liens and encumbrances against the property be satisfied to provide Ameriquest with the first mortgage lien position, and Ameriquest asked Northwest Title to "Advise LENDER when Recording [of the Ameriquest deed of trust] occurs." During the Ameriquest loan process and the foreclosure proceedings, Land Title had no knowledge of the Ameriquest transaction.

On June 21, 2003, the Battleses disclosed to Ameriquest that there were two loans secured by liens on the property: a $72,000 loan from Washington Mutual and a $260,000 loan from "Land Title," but the reference to Land Title was actually meant to refer to the RE Services loan. The Battleses did not disclose the indebtedness secured by the First Bank/Land Title deed of trust, and in a sworn statement of liabilities, they only disclosed the Washington Mutual loan. Northwest Title reviewed the Battleses' credit report, which referred to the Washington Mutual loan and to a U.S. Bank deed of trust (which was actually a reference to the First Bank/Land Title deed of trust). The credit report stated "account closed" and "account closed by consumer" in reference to the First Bank/Land Title deed of trust.

Based on that information, a Northwest Title employee erroneously authorized the Ameriquest loan of $550,000 to the Battleses to close on July 16, 2003. But the employee neglected to require that payment be made at the closing to retire the debt of the First Bank/Land Title deed of trust. The Ameriquest loan proceeds were disbursed as follows: (1) $71,347.02 was paid for the balance of the Washington Mutual loan; (2) $299,102.15 was paid to the Arapahoe County Public Trustee to redeem the property from the RE Services foreclosure; and (3) the remaining amount of $149,564.73 was paid to the Battleses, who chose not to pay the First Bank/Land Title deed of trust.

Accordingly, after the closing, the First Bank/Land Title deed of trust remained in default. Land Title filed a Notice of Election and Demand, which was recorded on August 19, 2003, and initiated foreclosure of its deed of trust. Land Title sent notices to all parties with record interests in the property as of August 19, 2003, including the Battleses, but did not notify Ameriquest because the Ameriquest deed of trust was not recorded until November 13, 2003.

On November 11, 2003, Land Title filed a C.R.C.P. 120 motion in the district court. Land Title sent the Battleses notice of this proceeding, requested that they pay the balance, and informed them by a letter dated November 14 that $149,904.67 would be re-

quired to satisfy the First Bank/Land Title obligation.

On December 8, 2003, the district court issued an order authorizing a sale of the property, and a foreclosure sale was held on December 17, 2003. Ameriquest did not receive notice of the foreclosure, the order authorizing the sale, or the certificate of purchase. Land Title bid $152,231.91 and was issued a Public Trustee's Certificate of Purchase of the property. Ameriquest and the Battleses had until February 15, 2004 to file a notice of intent to redeem with the public trustee, and until March 1, 2004 to exercise their right to redeem. However, Ameriquest only learned of the foreclosure on March 1, 2004, when the Battleses sent various documents to an Ameriquest employee, including the foreclosure notice, payoff notice, and notice of default and intent to foreclose.

On March 8, 2004, Land Title assigned its certificate of purchase of the property to Acquisitions, and the public trustee issued a deed for the property to it. Acquisitions later sold the property to a third party for $784,000 after investing $66,000 in improvements and paying $65,000 for the cost of the sale.

Land Title and Ameriquest stipulated that Acquisitions' sale of the property to the third party had no effect on their respective claims and defenses, and that any judgment by the trial court in favor of Ameriquest, or finding that it had a lien interest in the property, would be satisfied out of the net proceeds from the sale of the property.

After considering the parties' stipulations and other submissions, the trial court concluded that Ameriquest had shown all five requirements necessary for the application of equitable subrogation, *see Hicks v. Londre*, 125 P.3d 452 (Colo.2005); that Land Title and Acquisitions had been unjustly enriched by the foreclosure; and that the imposition of an equitable lien was necessary to prevent their unjust enrichment.

## II. Contentions

Land Title and Acquisitions contend the trial court erred in concluding that equitable subrogation was warranted in this case.

They maintain that Ameriquest is barred from recovery by its own negligence in failing to discover Land Title's lien and its Notice of Election and Demand recorded on August 19, 2003; and that Land Title and Acquisitions were not unjustly enriched by the purchase at the foreclosure sale and subsequent resale of the property to a third party. We disagree.

### A. Standard of Review

■ Initially, we address and reject Ameriquest's assertion that the standard of review we should apply is whether the trial court abused its discretion. Where, as here, the controlling facts are undisputed, the legal effect of those facts constitutes a question of law subject to de novo review. *See Hicks v. Londre, supra.*

### B. Recording Act

Colorado's Recording Act, § 38–35–101, et seq., C.R.S.2006, provides in relevant part:

No ... unrecorded instrument or document shall be valid against any person with any kind of rights in or to such real property who first records ... except between the parties thereto and against those having notice thereof prior to acquisition of such rights. This is a race-notice recording statute.

Section 38–35–109(1), C.R.S.2006.

■ The purpose of the Recording Act is to make title to real property and every interest therein more secure and marketable. Section 38–34–101, C.R.S.2006. The statute requires that the Act be "liberally construed ... so that subsequent purchasers and encumbrancers ... may rely on the record title and so that the record title of the party in possession is sustained and not defeated by technical or strict constructions." Section 38–34–101; *see Page v. Fees–Krey, Inc.*, 617 P.2d 1188, 1199 (Colo.1980) (Rovira, J., dissenting).

### C. Equitable Subrogation

■ Equitable subrogation is not viewed as a separate claim for relief, but is one of the various theories of unjust enrichment and need not be specifically pleaded. *Cedar*

Lane Invs. v. Am. Roofing Supply, Inc., 919 P.2d 879, 885 (Colo.App.1996); see Bainbridge, Inc. v. Travelers Cas. Co., 159 P.3d 748, 755 (Colo.App.2006).

■ Equitable subrogation allows the holder of an encumbrance on real property, like a mortgagee or lienholder, to assume the priority position of a previous mortgagee or lienholder rather than falling into line behind all recorded liens and encumbrances. In other words, it "allows a later-filed lienholder to leap-frog over an intervening lien and take a priority position," Hicks, supra, 125 P.3d at 456. The supreme court has characterized equitable subrogation "as a narrow exception to the Recording Act." Hicks, supra, 125 P.3d at 454, 459–60 ("Subrogation is not a matter of right, but is purely equitable in nature and will not be enforced when it would work an injustice to the rights of those having equal equities.").

■ There are five requirements for equitable subrogation: (1) the subrogee must have made the payment to protect its own interest, (2) the subrogee did not act as a volunteer, (3) the subrogee was not primarily liable for the debt paid, (4) the subrogee paid off the entire encumbrance, and (5) subrogation would not work any injustice to the rights of the junior lienholder. Hicks, supra, 125 P.3d at 456; see Green Tree Servicing v. U.S. Bank Nat'l Ass'n, 192 P.3d 1014 (Colo. 2007).

■ If no prejudice would result and the remaining factors are satisfied, courts must then consider the putative subrogee's knowledge of the intervening lien, its negligence in failing to discover the intervening lien, and its degree of sophistication. Equitable subrogation is not an absolute right, but "depends on the equities and attend[ant] facts and circumstances of each case." Universal Title Ins. Co. v. United States, 942 F.2d 1311, 1315 (8th Cir.1991) (citing Compania Anonima Venezolana de Navegacion v. A.J. Perez Export Co., 303 F.2d 692, 697 (5th Cir.1962)).

■ The trial court here relied on Leyden v. Citicorp Industrial Bank, 782 P.2d 6 (Colo.1989), and Hicks, supra, in concluding that an equitable lien was appropriate to prevent unjust enrichment. The court explained its reasoning:

> [U]nder the circumstances of this case, a ruling in equity is proper to restore the parties, to the extent possible under equitable principles, to their intended positions based on their security interests in the Property to prevent unjust enrichment to Land Title.

> The Court specifically finds that the application of the doctrine of equitable subrogation is appropriate in the circumstances of this case, and finds that all five parts of the Hicks test ... have been satisfied based on the Stipulated Facts.

> The Court finds that the application of equitable subrogation here does not work any injustice or cause any prejudice to Land Title and its application prevents an unintended windfall to Land Title. Ameriquest did not know of the Land Title Foreclosure proceedings until it was too late to protect its interests.

> By this ruling, the Court is exercising its equitable powers in applying the doctrines of equitable lien and equitable subrogation to put the parties in their intended positions. In reaching this conclusion, the Court has considered a number of factors and the Stipulated Facts, including that Ameriquest was not negligent and that it did not know of the Land Title Foreclosure as a result of mistakes by Northwest, which were compounded by fraud and fraudulent concealment by the Battles[es], and that Land Title will not be prejudiced by the equitable relief granted to Ameriquest.

We conclude there is record support for the trial court's determination that the requirements of equitable subrogation were met. It is undisputed that Ameriquest paid the entire balance of the Washington Mutual loan and other loans, that it did so in its own interest, and that it was not required to do so. There is also record support for the court's findings that Ameriquest was not negligent in relying on Northwest Title, and that Ameriquest was not aware of the Land Title foreclosure.

The trial court determined that Land Title did not suffer any prejudice because, under the court's judgment, its deed of trust would be paid in full and it would be reimbursed for the amounts it paid in improvements to the property and as costs of the sale. We acknowledge Land Title's argument that, but for the trial court's creation of an equitable lien, Land Title would have received title to the property free and clear of all liens and encumbrances recorded or filed after the recording of its lien. *See First Interstate Bank v. Tanktech, Inc.,* 864 P.2d 116, 119 (Colo. 1993) (upon foreclosure of the property First Interstate received title "free and clear" of a prior lease).

However, the supreme court disposed of this argument in *Hicks,* stating:

[A]n intervening lienholder suffers no prejudice merely by virtue of the fact that it is not elevated in priority. Hicks has no right to be better off after the sale transaction than he was beforehand. An intervening lienholder is not prejudiced because it occupies the same position it held prior to satisfaction of the preexisting obligation. *See* Restatement (Third) of Prop.: Mortgages, § 7.6 cmt. a ("The holders of intervening interests can hardly complain about this result, for they are no worse off than before the senior obligation was discharged. If there were no subrogation, such junior interests would be promoted in priority, giving them an unwarranted and unjust windfall.").

*Hicks, supra,* 125 P.3d at 457 (citations omitted).

This result also furthers the purpose of the foreclosure statutes, which is to pay off as many of the debts of the debtor as possible. *See Sant v. Stephens,* 753 P.2d 752 (Colo. 1988).

In this case, the application of equitable subrogation following the foreclosure sale serves to fulfill that purpose and pay more of the Battleses' debts by satisfying the Land Title lien in full and paying a major part of the Ameriquest lien. Otherwise, Land Title would receive a windfall at the expense of the other creditors, particularly Ameriquest. We thus conclude application of the doctrine in this case serves the underlying policy of the foreclosure statutes.

We recognize there are factual distinctions between *Leyden* and the instant case. In *Leyden,* the court concluded an equitable lien was valid against all persons who acquired an interest in the property with knowledge or notice of the lien, but was not enforceable against persons who had acquired an interest without such knowledge or notice. Here, it is undisputed that Land Title acquired its interest in the property without knowledge or notice that Ameriquest had an actual or equitable lien.

However, in *Hicks,* which was decided several years after *Leyden,* the supreme court concluded that equitable subrogation was warranted and that the intervening lienholder was not prejudiced by the equitable subrogation of a new mortgagee for an old mortgagee. The court reasoned that the intervening lienholder had no right to be better off after the sale than it was before the sale had occurred. The same can be said about Land Title in the case before us.

Land Title also points out that in *Hicks,* the intervening lienholder asserted his claim to equitable subrogation *before* the foreclosure sale, whereas Ameriquest did not assert its claim until *after* the foreclosure sale had occurred, the redemption period had expired, and Land Title had acquired title to the property that was "free and clear." *See First Interstate Bank v. Tanktech, Inc., supra,* 864 P.2d at 119. But the supreme court recognized this anomaly in *Hicks, supra,* 125 P.3d at 458, and stated:

Equitable subrogation is an exception to the Recording Act. The statute and the doctrine are in direct conflict with one another. However, since the doctrine has existed in our case law for a century, and the legislature has not seen fit to abrogate it during that period of time, we must give credence to our precedent and apply the doctrine within its narrow confines.

We are also guided by the reasoning of *Bank of America v. Presance Corp.,* 160 P.3d 17 (Wash.2007). There, the Washington Supreme Court concluded that a refinancing mortgagee is not precluded from equitable subrogation, even if the mortgagee has actual

knowledge of the intervening lien. The Washington court discussed the policy considerations that strongly support the application of equitable subrogation in refinancing cases, and explained how it helps homeowners by eliminating the risk of loss of mortgage priority for refinancing lenders:

> [B]y facilitating more refinancing, equitable subrogation helps stem the threat of foreclosure. An Iowa court recognized how important equitable subrogation is for homeowners. In *Klotz v. Klotz,* [440 N.W.2d 406 (Iowa Ct.App.1989)], Roland Klotz owned a parcel of land that had a mortgage on it and a junior lien against it from his ex-wife, Germaine. Roland's mother, Nettie, paid the mortgage because the bank was threatening foreclosure. The court liberally applied equitable subrogation to prevent forfeiture: "There are particularly strong arguments in Iowa for allowing one, who at the contract purchaser's request pays off a vendor, to be subrogated to the vendor's position. This is especially true where there is a threat of forfeiture. By allowing subrogation there is an incentive for one to advance sums to help a property owner avoid forfeiture." *Klotz,* 440 N.W.2d at 410. It is in everyone's interest to prevent foreclosure....
>
> ... [A] liberal equitable subrogation doctrine can save billions of dollars by reducing title insurance premiums. Title insurance primarily ensures there are no intervening liens, and when a jurisdiction adopts the liberal view of equitable subrogation, the insurance premium is greatly reduced. These savings eventually benefit homeowners because title insurance premiums are mostly passed on to them....

*Bank of Am. v. Presance Corp., supra,* 160 P.3d at 28 (footnote omitted).

The Washington case is instructive because the court adopted § 7.6 of the Restatement (Third) of Property in reaching its conclusion. While our supreme court did not formally adopt § 7.6 of the Restatement in *Hicks, supra,* it discussed the Restatement at some length and acknowledged that "Colorado law on this point [whether the knowledge or constructive knowledge of an inter-

vening lienholder is sufficient to defeat an equitable subrogation claim] is closer to the Restatement." *Hicks, supra,* 125 P.3d at 458.

### D. Requirement of Wrongful Conduct

■ Relying on *DCB Construction Co. v. Central City Development Co.,* 965 P.2d 115, 122 (Colo.1998), Land Title and Acquisitions also contend the trial court erred as a matter of law because (1) the purpose of equitable subrogation is to prevent unjust enrichment; and (2) unjust enrichment requires "some type of improper, deceitful, or misleading conduct" by Land Title and Acquisitions. We conclude *DCB Construction* is distinguishable.

There, a contractor was hired by the tenant of a building to make improvements and when the tenant failed to make the payments due under the contract, the contractor filed an unjust enrichment action against the owner of the property. The trial court entered judgment for the contractor on its unjust enrichment claim.

The supreme court set aside the judgment, holding, as relevant here, that in order for the tenant's contractor to impose liability on the owner-lessor of the property for unjust enrichment, the contractor had to show the owner-lessor had engaged in some form of improper, deceitful, or misleading conduct. Because the contractor failed to do so, the supreme court concluded as a matter of law that the owner-lessor was not unjustly enriched by contractor's performance of its contract with the lessee. *DCB Constr. Co., supra.*

Nevertheless, the supreme court clarified numerous times throughout its opinion that its decision had to be viewed in context. *DCB Constr. Co., supra,* 965 P.2d at 120, 121 n. 8, 122 & n. 9 ("we think it is important to articulate a general rule, *applicable in this context,* that provides more stability and predictability than an ad hoc review"; "[w]e next proceed to apply this general test to this case *in the context* of tenant finish construction"; "[i]t is also doubtful that the doctrine of mistake would apply *in this third-party context* since such mistake, whether unilateral or not, is not likely to have been connected in

any manner to the landlord"; "injustice *in this context* requires some type of improper, deceitful, or misleading conduct"; "[the owner-lessor's] 'acceptance' of the work carries no significance *in this context* where the work was an expected result of its lease with Tenant" (emphases added)); *cf. Bainbridge, supra*, 159 P.3d at 752 ("Although the quoted language ... is an accurate statement of law, *when read in its proper context*, it does not address [the issue before the division]." (emphasis added)).

We do not read the court's opinion in *DCB* as requiring a showing of wrongful conduct in every unjust enrichment case. *See DCB Constr. Co., supra*, 965 P.2d at 125 (Mullarkey, C.J., dissenting) ("The majority acknowledges that circumstances other than improper conduct could prove unjust enrichment."); Restatement (First) of Restitution § 112 (1937)("A person who *without mistake, coercion or request* has unconditionally conferred a benefit upon another is not entitled to restitution, except where the benefit was conferred under circumstances making such action necessary for the protection of the interests of the other or of third persons." (emphasis added)).

We also observe that a number of Colorado cases decided before *Hicks* similarly applied equitable subrogation under analogous circumstances to correct a mistake. *See W. Fed. Sav. & Loan Ass'n v. Ben Gay, Inc.*, 164 Colo. 407, 436 P.2d 121 (1967) (where first deed of trust has been released through mistake of fact, equity may intervene to correct the mistake); *Holt v. Mitchell*, 96 Colo. 412, 43 P.2d 388 (1935) (concluding the mistake need not depend on the degree of care used to ascertain the existence of the second mortgage, but on the state of mind of the plaintiff with respect to its existence). Other jurisdictions have done the same. *Accord United States v. Avila*, 88 F.3d 229 (3d Cir.1996)(holding that a purchaser of land who paid off a senior mortgage under mistaken belief that a junior federal tax lien on the land was no longer enforceable was subrogated to the mortgagee's rights); *Washington Mut. Bank, FA v. Aultman*, 172 Ohio App.3d 584, 876 N.E.2d 617 (Ohio App. 2007) (2007 WL 2070357) ("[O]ne of the purposes of employing equitable subrogation is to provide relief against mistakes." (quoting *State, Dept. of Taxation v. Jones*, 61 Ohio St.2d 99, 102, 399 N.E.2d 1215 and *Canton Morris Plan Bank v. Most*, 44 Ohio App. 180, 184, 184 N.E. 765 (1932)); *Farm Credit Bank v. Ogden*, 886 S.W.2d 305 (Tex.App.1994)(new lender granted subrogation to an old mortgage where it discharged the debt, even though title company failed to obtain a subordination from the holder of an intervening lien)).

In *Holt v. Mitchell, supra*, the defendants executed five promissory notes which were recorded, and the notes were later transferred to the plaintiff. Thereafter, the defendants executed another note to a third party secured by a trust deed on the same lands. It was also recorded. The defendants then gave a new note to the plaintiff, secured by a new trust deed on the same lands, which was recorded.

After all of the trust deeds had been recorded, one of the defendants filed a transcript of judgment to effect a lien on the lands. Simultaneously with the recording of the new trust deed, the plaintiff released the original trust deed without actual knowledge that there was an intervening lien. The plaintiff alleged that the new trust deed was executed in lieu of the original trust deeds given to secure the original notes and "as a renewal and extension of such prior obligation." *Holt, supra*, 96 Colo. at 414, 43 P.2d at 389. The Colorado Supreme Court concluded the plaintiff's mistake did not bar equitable relief that gave the renewal deed priority over the intervening deed, provided that the plaintiff showed he was not negligent in executing the release. *Holt, supra*.

Similarly, here, a mistake prevented Ameriquest from discovering Land Title's intervening lien and from receiving notice of the foreclosure sale through no negligence on the part of Ameriquest. No party was injured by the mistake except for Ameriquest, and no party changed position as a result of the mistake. Therefore, we conclude the trial court did not abuse its discretion in determining equitable relief was warranted. *See Holt, supra*.

■ Contrary to Land Title's contention, the fact that the foreclosure sale had already occurred did not preclude the application of the doctrine of equitable subrogation. Certainly, the fact that a foreclosure sale has already occurred is one factor a trial court should consider in determining whether an intervening lienholder would be prejudiced by an equitable lien. However, we have found no authority holding that after a foreclosure sale has been held, an order granting equitable subrogation is barred.

In *Mortoro v. Maloney*, 580 So.2d 822 (Fla.Dist.Ct.App.1991), a borrower assigned to a lender bank the borrower's interest in a note that was due him to pay off and release his obligation to the lender bank. The note was secured by a second mortgage on certain property. The borrower also guaranteed the assigned note as consideration for his release. There was a default on the note, and the real estate securing the note went into foreclosure. Following the foreclosure sale, a surplus of over $100,000 remained, and the borrower sought to be equitably subrogated to the bank's position regarding the surplus funds. The court held that subrogation was proper and that the borrower stood in place of the bank and was entitled to the priority it enjoyed. *Mortoro v. Maloney, supra,* 580 So.2d at 823; *see also Houston Inv. Bankers Corp. v. First City Bank,* 640 S.W.2d 660 (Tex.App.1982)(in an action to remove a cloud upon the title to real property, the court concluded that a creditor's judgment was *not* extinguished by foreclosure of the deed of trust through which the creditor claimed title, and that creditor's assignor was equitably subrogated to a prior lien on the property); *cf. Hochstadt v. Gerl,* 678 So.2d 1310 (Fla. Dist.Ct.App.1996) (concluding trial court abused its discretion in failing to designate the assignee of a corporation as a party entitled to receive real estate taxes which were paid before foreclosure by failed mortgagee to protect its mortgage lien pursuant to an agreement where corporation assigned all its claims, including subrogation rights).

In summary, the trial court here determined, with record support, that none of the parties had engaged in any wrongdoing, but that equitable subrogation was warranted based on Ameriquest's mistake in relying on its title insurance company. *See Hicks, supra,* 125 P.3d at 460 ("[E]ven for [a sophisticated] lender, reliance upon a title insurance company is not evidence of negligence."). Under these circumstances, we conclude Ameriquest's failure to present evidence of wrongdoing by Land Title did not preclude Ameriquest's claim for equitable subrogation. *See Hicks, supra; Bank of Am. v. Presance Corp., supra.*

### E. Damages

■ Finally, Land Title and Acquisition contends that even if equitable subrogation were appropriate in this case, the trial court erred or abused its discretion in determining the amount of damages it awarded to Ameriquest. According to Land Title and Acquisitions, Ameriquest was only entitled to be subrogated to the amount it paid to satisfy the Washington Mutual deed of trust ($71,347), and the balance of the net proceeds ($429,421) should have been awarded to Land Title and Acquisitions. We disagree.

■ As a general rule, a "payor is subrogated only to the extent that the funds disbursed are actually applied toward the payment of the prior lien. There is no right to subrogation with respect to any excess funds." *East Boston Sav. Bank v. Ogan,* 428 Mass. 327, 330, 701 N.E.2d 331, 334 (1998) (quoting Restatement (Third) of Property (Mortgages) § 7.6, comment e (1997)).

However, the decisions reciting this rule and relied upon by Land Title and Acquisitions are distinguishable because they addressed the priority of lienholders with existing interests in real property. For example, in *East Boston Sav. Bank v. Ogan, supra,* 428 Mass. at 328, 701 N.E.2d at 333, the purchaser of a condominium and the bank that held the mortgage on it brought an action seeking a declaratory judgment that the bank's mortgage had priority over a second mortgage on condominiums, because its proceeds had been used to satisfy the original mortgage on the property. The court, applying the doctrine of equitable subrogation, concluded the new mortgage had priority. *See Union Planters Bank, N.A. v. FT Mortg. Companies,* 341 Ill.App.3d 921, 794

**606**

N.E.2d 360 (2003) (determining the priority of existing mortgage liens); *Houston v. Bank of America Federal Savings Bank*, 119 Nev. 485, 78 P.3d 71 (2003)(Lender who refinanced property intervened and sought an injunction preventing a writ of execution and sale of the property; court enjoined the sale and concluded that the lender, who had paid off a prior note, was equitably subrogated to the former lender's priority position with respect to the property).

Here, however, the property that was the subject of the liens was sold to a third party, and it is undisputed that at the time of the trial court's ruling, neither Ameriquest or Land Title had liens on the property to prioritize. Land Title and the other lienholders had been fully paid with Ameriquest's funds.

Furthermore, Ameriquest loaned the Battleses $550,000, and the trial court's award to Ameriquest of the net proceeds of the sale ($500,768) did not even make it whole, much less confer on Ameriquest any unjust enrichment. Thus, after viewing these facts in context, we conclude there were no excess funds.

Land Title and Acquisitions make much of the fact that the Battleses received $149,565 at the closing which should have been paid to Land Title. We agree this was unfortunate. Nevertheless, it is undisputed that Land Title was fully paid when the property was sold, and under these circumstances, we discern no reason why the mistake payment to the Battleses should result in an order enriching Land Title by over $400,000.

Accordingly, we conclude the trial court did not err or abuse it's discretion in determining the amount of damages.

Judgment affirmed.

Judge CASEBOLT and Judge ROMÁN concur.