LAND TITLE INSURANCE CORPORA-
TION, a Colorado corporation; and Ti-
tle Acquisitions, Inc., Petitioners

v.

AMERIQUEST MORTGAGE COMPANY,
a Delaware corporation, Respondent.

No. 07SC937.

Supreme Court of Colorado,
En Banc.

May 11, 2009.

Hamil/Hecht LLC, J. Lawrence Hamil,
Valissa A. Tsoucaris, Denver, Colorado, At-
torneys for Petitioners.

Knaak & Kantrud, P.A., Frederic W.
Knaak, Vadnais Heights, Minnesota, Attor-
neys for Respondent.

Justice BENDER delivered the Opinion of
the Court.

### Introduction

We granted certiorari in this case to re-
view the court of appeals' judgment in *Amer-
iquest Mortgage Co. v. Land Title Insurance
Co.,* —— P.3d ——, 2007 WL 2128203, No.
06CA0847, slip. op. (Colo.App. July 26,
2007).[1] In this case, which arises from the
foreclosure and sale of real property, we are
concerned with the application of the princi-
ple of equitable subrogation: the right of a
payor of an encumbrance on real property to
revive and enforce this obligation against the
property and to maintain the discharged obli-
gation's lien priority as against other, inter-
vening liens.

In this case, we must determine whether
the court of appeals correctly applied the
doctrine of equitable subrogation. The court
held that Respondent Ameriquest, a lender

---

1. We granted certiorari review of the following
issues:
   1. Whether the court of appeals' application
   of the doctrine of equitable subrogation on the
   facts of this case abrogates section 38-38-501,
   C.R.S.
   2. Whether the court of appeals' decision af-
   firming imposition of equitable subrogation to
   the facts of this case is not in accord with

applicable decisions of this court, including
specifically *Hicks v. Londré,* 125 P.3d 452
(Colo.2005).
   3. Whether the court of appeals' decision af-
firming subrogation in an amount greater than
the funds applied to pay off the prior lien is not
in accord with applicable decisions of this
Court.

who provided a refinancing loan to the property owners, could recover almost all the money it loaned to the property owners despite Petitioner Land Title's interest in the property. *Land Title*, ‐‐ P.3d at ‐‐, No. 06CA0847, slip. op. at 10.

■ Under the doctrine of equitable subrogation, a party seeking to enforce its subrogation rights may not do so if subrogation would prejudice intervening lienholders. *Hicks v. Londré*, 125 P.3d 452, 456 (Colo. 2005) ("*Hicks II* "). Land Title argues that the court of appeals erred in concluding that Land Title would not be prejudiced were Ameriquest permitted to enforce its subrogation rights. Specifically, Land Title points to the fact that Ameriquest delayed recording its interest against the property for several months after it had satisfied the senior liens against the property. Consequently, the record state of title showed Land Title as having the first lien against the property. In reliance on the record state of title, Land Title then bid on the property at the public trustee's foreclosure sale, invested money in refurbishing the property, and sold the property to a third party purchaser.

We agree with Land Title that, because it detrimentally changed its position in reliance on the record state of title, it would be prejudiced were Ameriquest permitted to enforce its subrogation rights, if any, in this case.[2] We reverse the judgment of the court of appeals. The case is remanded to the court of appeals with instructions to vacate the trial court's order and return the case to the trial court for proceedings consistent with this opinion.

2. Because we hold that Land Title would be prejudiced by enforcement of Ameriquest's subrogation rights and thus that the factors enunciated in *Hicks II* are not satisfied in this case, we do not reach the question of whether application of equitable subrogation here contravenes section 38-38-501, C.R.S. (2004) (as articulated in the first question presented for review) nor do we reach the question of whether the court of appeals' erred in granting subrogation to Ameriquest as to amounts in excess of the amount applied to payment of the prior liens (as articulated in the second question presented for review).

## Facts and Proceedings Below

This case was submitted to the district court for trial on stipulated facts and exhibits. We summarize the relevant facts here.

In 1986, Ronald and Josephine Battles acquired a home in Englewood, Colorado. As of November 2002, there were three liens against the property with priority as follows: (1) a deed of trust in favor of Washington Mutual Bank, F.A. ("Washington Mutual deed of trust"); (2) a deed of trust in favor of RE Services, L.L.C. ("RE Services deed of trust"); and (3) a deed of trust in favor of Land Title ("Land Title deed of trust"). In March 2003, due to nonpayment by the Battles, RE Services initiated foreclosure of its lien.

During the pendency of RE Services' foreclosure proceedings, the Battles applied to Ameriquest for a new loan to refinance the property. The terms of the Ameriquest loan called for the satisfaction of all liens and encumbrances against the property as necessary to provide Ameriquest's deed of trust with the first priority lien position. In June 2003, the Battles executed a promissory note in the amount of $550,000, which was secured by a deed of trust in favor of Ameriquest ("Ameriquest deed of trust").

On July 16, 2003, Northwest Title and Escrow Corp. ("Northwest"), which Ameriquest had retained to handle the loan closing, authorized disbursement of the loan proceeds as follows: (1) $71,347.02 was paid to Washington Mutual to satisfy its deed of trust (the most senior deed of trust); (2) $299,102.15 was paid to the Arapahoe County Public Trustee to redeem the property out of RE Services' foreclosure[3]; (3) $149,564.73 was

Note that we apply the 2004 Colorado statutes with respect to events occurring in 2004, and the 2003 version to events occurring in 2003, because Colorado's foreclosure statutes have been significantly amended in the time since the events of this case took place. *See People ex rel. N.R.*, 139 P.3d 671, 675–76 (Colo.2006); *Pollock v. Highlands Ranch Cmty. Ass'n, Inc.*, 140 P.3d 351, 353–54 (Colo.App.2006).

3. This money was eventually paid to the holder of the certificate purchase: the third party who had the highest bid at the foreclosure sale.

disbursed directly to the Battles.[4] Even though the amount disbursed to the Battles would have been sufficient to discharge the Land Title deed of trust, that lien was not satisfied out of the proceeds of Ameriquest's loan.

Northwest's failure to satisfy the Land Title deed of trust out of the Ameriquest loan proceeds, despite Ameriquest's instructions that all liens and encumbrances against the property be paid off, is attributable to a combination of misrepresentation by the Battles regarding the existence of the lien and error on the part of Northwest. In their application for refinancing and elsewhere, the Battles consistently represented that only two liens against the property existed: the Washington Mutual deed of trust and the RE Services deed of trust.

For its part, Northwest was aware of the Land Title deed of trust before closing the Ameriquest loan, but thought the Battles had discharged this obligation based on its review of the Battles credit report, which showed that their account with Land Title's predecessor in interest was "closed"; the Battles' own representations; and a search of the Recorder's grantor/grantee index. The parties also stipulated that the Northwest employee in charge of the Ameriquest loan closing would testify that he sought confirmation from Land Title Guarantee Company[5] that the Land Title deed of trust had been discharged. Although the Northwest employee received no response either confirming or disconfirming his belief that the lien was extinguished, he nevertheless authorized disbursement of the Ameriquest loan. Despite Ameriquest's instructions to record its deed of trust after closing, Northwest failed to do

so until several months later, on November 13, 2003.

On August 19, 2003, a few weeks after the Ameriquest loan proceeds were disbursed and the two senior liens on the property were discharged, Land Title initiated foreclosure of the Land Title deed of trust by filing a notice of election and demand for sale.[6] Although Ameriquest did not receive notice of the foreclosure proceedings, the parties stipulated that Land Title nevertheless complied with the applicable notice statutes, given Northwest's tardy recordation of Ameriquest's interest.[7] By letter dated November 14, 2003, Land Title advised the Battles that $149,904.67 was required to pay off their obligation under the Land Title deed of trust.

On December 8, 2003, pursuant to Land Title's foreclosure, the Arapahoe County District Court issued an order authorizing the sale of the property, and a foreclosure sale was held on December 17. At the foreclosure sale, Land Title bid $152,231.91, representing the amount the Battles owed on the obligation secured by the deed of trust. Land Title had the high bid and was issued a public trustee's certificate of purchase. The owner's statutory 75–day redemption period expired March 1, 2004.

Ameriquest first learned of Land Title's foreclosure on March 1, the same day the owner's redemption period expired. As a result, Ameriquest did not timely file a notice of intent to redeem the property. *See* §§ 38–38–302, –303, C.R.S. (2004).

Land Title assigned the certificate of purchase to its related entity, Title Acquisitions, Inc. ("Title Acquisitions"), and on March 23, 2004, the public trustee issued a deed to Title Acquisitions. Title Acquisitions invested approximately $66,000 to refurbish the proper-

---

4. $30,473.10 was retained as settlement charges.

5. Land Title Guarantee Company is a separate legal entity related to Land Title that provides closing services.

6. When recorded by the public trustee, a notice of election and demand for sale commences the public trustee foreclosure process. § 38–38–101, C.R.S. (2003). The notice of election and demand for sale makes demand on the public trustee to give notice, advertise for sale, and sell the property described in the notice. *Id.*

7. Because it is undisputed that Ameriquest's interest was not recorded until well after the notice of election and demand was filed, this stipulation appears to be correct. *See* §§ 38–38–101(7)(a), 103(2), C.R.S. (2003); C.R.C.P. 120(a) (2003). Ameriquest was not entitled to notice of foreclosure and therefore is not an "omitted party" entitled to maintain its junior lien in spite of the senior lienholder's foreclosure. *See* § 38–38–506, C.R.S. (2004).

ty and then sold the property to a third party for $784,000. After accounting for the purchase price, its investment in the property, and sales costs (approximately $65,000), Land Title/Title Acquisitions' net proceeds from the sale totaled $500,768.09. The parties stipulated that, in the event of a judgment in Ameriquest's favor, Ameriquest will seek repayment and satisfaction of its liens out of the net proceeds of this sale, rather than through foreclosure of its senior liens. In addition, the parties stipulated that the third party sale has no effect on their respective claims and defenses.

The trial court ruled that Ameriquest was entitled to all of Land Title's net proceeds from the third party sale of the subject property based on theories of both equitable lien and equitable subrogation. It ruled that the five elements of equitable subrogation enunciated in *Hicks II* were met. The court further ruled that an equitable lien in favor of Ameriquest against the entire net proceeds of the third party sale was necessary to prevent Land Title's unjust enrichment. The trial court's precise rationale for this last ruling is unclear, but the court emphasized the fact that Ameriquest, through no fault of its own, was entirely ignorant of the ongoing foreclosure proceedings and, therefore, was unable to protect its interest in the property. The trial court appears to have relied on both theories, equitable lien and equitable subrogation, in ruling on the damage award.

The court of appeals affirmed the trial court's ruling. *Land Title*, ── P.3d at ──, No. 06CA0847, slip. op. at 10. That court held that Ameriquest satisfied the *Hicks II* factors and was therefore equitably subrogated to the liens it satisfied. *Id.* at ── ──, at 5–6. Although the court acknowledged Land Title's arguments that it would suffer prejudice were Ameriquest permitted to subrogate to the senior lien positions, the court of appeals nonetheless held that equitable subrogation would simply return Land Title to the original lien position it occupied prior to Ameriquest's payment of the liens ahead of Land Title's. *Id.* at ──, at 6. The

court of appeals also appears to have approved the trial court's ruling on Ameriquest's unjust enrichment theory.[8] *Id.* at ──–──, at 6–8. It is unclear, however, whether the court viewed this theory as a separate ground for recovery, or incorporated the theory into its equitable subrogation analysis. *See id.*

As to damages, the court of appeals acknowledged that a foundational principle of equitable subrogation is that the subrogee may not claim lien priority for an amount in excess of the amount of the obligation discharged. *Id.* at ──, at 10. However, it declined to apply this rule for two reasons. *Id.* First, it stated this rule only applied when the opposing parties have existing interests in the property. *Id.* The court then distinguished the present case from equitable subrogation cases cited by Land Title on the ground that neither party here had any interest in the property. *Id.* Second, the court of appeals concluded that Ameriquest would not be made whole unless it could claim a lien against all the net proceeds of Title Acquisition's third party sale. *Id.* In contrast, the court reasoned, Land Title would be "fully paid" even if it, or more properly its affiliate Title Acquisitions, were forced to disgorge the profits made on the third party sale. *Id.* In this way, the court of appeals redistributed the proceeds of Title Acquisition's sale in order to make Ameriquest as whole as possible.

## I. Equitable Subrogation

Subrogation is an equitable remedy designed to avoid a person's receiving an unearned windfall at the expense of another. Restatement (Third) of Property (Mortgages) § 7.6 cmt. a (1997). In the real property context, subrogation rights may arise when a payor performs in full an obligation owed by another and secured by a mortgage, deed of trust, or other lien. *Id.* The effect of equitable subrogation is to revive the discharged lien and obligation, and assign them to the payor by operation of law. *Id.* Thus, when a

8. We did not grant certiorari review on the question of whether the court of appeals correctly applied the doctrine of equitable lien, and, for that reason, we do not decide the merits of this theory. On remand, the district court will be required to determine whether this theory should be applied in light of today's decision.

payor is subrogated to the rights of a prior lender, the payor may enforce the seniority of the prior lender's lien as against any junior intervening liens. *Id.*

However, it is universally acknowledged that there is no right of subrogation as to amounts in excess of the amount paid to discharge the prior lien.[9] Restatement (Third) of Property (Mortgages) § 7.6 cmt. e. Not only is the subrogation limited to the amount of the advance actually applied to payment, but the subrogee also may not enforce mortgage terms, for example an interest rate or maturity date, materially different from the terms of the mortgage it has satisfied. *Hicks II*, 125 P.3d at 457. This principle is derived both from the fact that equitable subrogation acts only as a revival and assignment of the discharged obligation and security, rather than a substitution of a new obligation in place of another, and the rule that intervening lienholders may not suffer prejudice as a consequence of subrogation. *Id.*; Restatement (Third) of Property (Mortgages) § 7.6 cmt. a.

In *Hicks II*, we articulated five factors "outlining the circumstances" in which equitable subrogation may apply: (1) the subrogee made the payment to protect its own interest; (2) the subrogee did not act as a volunteer; (3) the subrogee was not primarily liable for the debt paid (thus, a surety or guarantor would be able to subrogate to the rights of a senior lienholder); (4) the subrogee paid off the entire encumbrance; and (5) subrogation would not prejudice the inter-

vening lienholder or lienholders. 125 P.3d at 456.

Even if the foregoing elements are satisfied, we further held that the doctrine may be invoked "only within the overall context of equity and the specific facts of each case." *Id.* at 457. To that end, we held that further inquiry should be made into the payor's knowledge of intervening liens, its negligence in failing to discover those liens, and the payor's sophistication. *Id.* at 457–58. However, we noted that constructive knowledge alone, without some affirmative negligence on the part of the payor in failing to discover a prior recorded lien, would not be enough to defeat the right to equitable subrogation.[10] *Id.* at 458. Finally, even where the payor has actual knowledge of an intervening lien, we have held that subrogation is nevertheless appropriate where the payor was induced by some mistake of fact to satisfy the senior deed or deeds of trust. *W. Fed. Sav. & Loan Ass'n of Denver v. Ben Gay, Inc.*, 164 Colo. 407, 412, 436 P.2d 121, 123 (1967).

## II. Land Title Would Be Prejudiced Were Ameriquest Permitted Equitable Subrogation in this Case

■ If a payor fails to timely record an interest it claims through equitable subrogation, that delay in recordation may bar enforcement of equitable subrogation rights when another party detrimentally relies on the state of title as recorded. Restatement (Third) of Property (Mortgages) § 7.6 cmt. f; *see also Rock River Lumber Corp. v. Universal Mortgage Corp.*, 82 Wis.2d 235, 262

---

9. Because there is no right of subrogation for amounts in excess of the amount paid to discharge the prior lien, the security for these excess amounts falls in line behind other liens, taking priority as under the recording acts. Restatement (Third) of Property (Mortgages) § 7.6 cmt. e.

10. We recently granted certiorari review of the court of appeals' decision in *Hicks v. Joondeph*, 205 P.3d 432 (Colo.App.2008). We granted review of the following three questions:

    1. Whether the court of appeals' refusal to apply the doctrine of derivative subrogation— the right of property owners to transfer equitable subrogation rights, by way of warranty deed, to subsequent purchasers—improperly deprives property owners of their equitable

subrogation rights and unjustly results in the conveyance of a diminished estate.

    2. Whether, if this court declines to follow the doctrine of derivative subrogation, this court should abandon the rule that a lender's actual knowledge of intervening liens prevents that lender's ability to enforce the obligation it satisfied under the doctrine of equitable subrogation.

    3. Whether, if the court abandons this rule, Petitioners may equitably subrogate to the senior lien position on the property.

In the present case, we do not need to reach the question of whether to abandon the "actual knowledge" rule because we hold that Ameriquest is barred from enforcing its subrogation rights, if any, on grounds of prejudice to Land Title alone.

N.W.2d 114, 119 (1978). Prejudice in the context of equitable subrogation almost always "flows from a delay by the payor in recording his or her new mortgage, in demanding and recording a written assignment, or in otherwise publicly asserting subrogation to the mortgage paid." Restatement (Third) of Property (Mortgages) § 7.6 cmt. f.

There are many examples of detrimental reliance that may result from the payor's delay in recording his equitable subrogation interest. For example, in the time between the payor's payment of the prior lien and recordation of its claimed interest, the property might be sold to an innocent purchaser or refinanced by an innocent lender who, relying on the record state of title, believes the property is free from other encumbrances. *See, e.g., Persons v. Shaeffer,* 3 P. 94, 95 (Cal.1884); *Peterman–Donnelly Eng'rs & Contractors Corp. v. First Nat'l Bank of Ariz.,* 2 Ariz.App. 321, 408 P.2d 841, 846 (1965). Similarly, an intervening mortgage could be resold on the secondary mortgage market during the time between satisfaction and recordation to a purchaser who, relying on the recorded state of title, believes that the mortgage it has purchased occupies the senior lien position against the property. *Richards v. Suckle,* 871 S.W.2d 239, 242 (Tex. App.1994) (holding that because the investor taking assignment of the mortgage was found to have notice of the subrogation claim, subrogation was appropriate). Finally, an intervening lienholder may be prejudiced if it commences foreclosure or purchases the property at the foreclosure sale in detrimental reliance on the record state of title. *See Heegaard v. Kopka,* 55 N.D. 77, 212 N.W. 440, 442 (1927); *Richards v. Griffith,* 92 Cal. 493, 28 P. 484, 485 (1891); 2 Grant S. Nelson & Dale A. Whitman, *Real Estate Finance Law* § 10.6 at 28 (5th ed.2007).

In the present case, Land Title asserts this last ground as the basis for its claim of prejudice. First, it argues that it initiated foreclosure by filing its notice of election and demand for sale in reliance on the record state of title. It is undisputed that Ameriquest's interest had not yet been recorded at the time Land Title filed its notice of election and demand. Therefore, Land Title argues, when it commenced foreclosure, it reasonably believed that it held the first lien against the property. However, to claim prejudice, a party's reliance must be detrimental. Here, Land Title suffered no detriment by commencing foreclosure of its lien, an act of reliance we distinguish from its purchase of the property at the foreclosure sale. Land Title recouped the full amount due on the obligation secured by its deed of trust at the foreclosure sale. Such an outcome is the most a lender, in its role as the foreclosing party (and not as a purchaser), can hope for. § 38–38–111, C.R.S. (2004) (foreclosing lienholder has no right to funds in excess of the amount owed on the obligation plus the "expenses of [foreclosure] sale").

Second, Land Title argues that it would be prejudiced because it detrimentally relied on the record state of title when it bid on the property at the foreclosure sale with the reasonable belief that it would be able to resell the property free and clear of all encumbrances. The record supports such detrimental reliance, as it reflects the fact that Land Title's sister entity, Title Acquisitions, invested money and effort in refurbishing the property.

Although it is undisputed that Ameriquest recorded its interest before the foreclosure sale actually took place, the recordation in this case did not sufficiently put Land Title on notice that Ameriquest was claiming equitable subrogation rights. Ameriquest's deed of trust makes no reference to any claimed subrogation rights, nor does it explain that the proceeds of the loan secured by the deed of trust were used to satisfy the senior liens against the property. A reasonable purchaser, therefore, would have no way of knowing that Ameriquest was claiming first lien priority against the property for the amounts applied to payment of the Washington Mutual deed of trust and redemption of the property from foreclosure of the RE Services deed of trust. Instead, a reasonable purchaser at the foreclosure sale who checked title before bidding would simply believe that Ameriquest's deed of trust, as a lien "junior to the lien foreclosed," would be extinguished by expiration of the redemption period. § 38–38–501, C.R.S. (2004). As the Restatement

makes clear, a party seeking to enforce claimed subrogation rights must "publicly asser[t] subrogation to the mortgage paid" or risk being barred from asserting its rights by another party's subsequent claim of prejudice arising from detrimental reliance on the record state of title. Restatement (Third) of Property (Mortgages) § 7.6 cmt. f.

We leave for another day resolution of the issue of precisely what a recorded subrogation interest must say in order to put others on notice of the claimed interest. In the present case, we simply hold that Ameriquest's deed of trust failed to give any notice that Ameriquest was claiming lien superiority through equitable subrogation and, therefore, Land Title's reliance on record title as showing the property free of encumbrances was reasonable. We note that the reasonableness of a party's reliance on the record state of title should be the guiding principle in determining whether that party can claim prejudice arising from such reliance.

Because Land Title purchased the property with the belief that it would own the property free and clear of all encumbrances and because Ameriquest's deed of trust was insufficient to put Land Title on notice that its belief was mistaken, we hold that enforcement of Ameriquest's subrogation rights, if any, would prejudice Land Title.

### Conclusion

For the reasons stated, we hold that Ameriquest is barred from enforcing its equitable subrogation rights, if any. We reverse the judgment of the court of appeals. The case is remanded to the court of appeals with instructions to vacate the trial court's order and return the case to the trial court for proceedings consistent with this opinion.